PX 20C

**SEVEN RESORTS, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 09–184C

United States Court of Federal Claims.

Filed: September 16, 2013

Kevin R. Garden, The Garden Law Firm P.C., Alexandria, VA, for plaintiff.

A. Bondurant Eley, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her were Franklin E. White, Jr., Assistant Director, Jeanne E. Davidson, Director, Commercial Litigation Branch, and Stuart F. Delery, Assistant Attorney General, Civil Division, Washington, D.C.

Partial Summary Judgment; National Parks Service Concessions Contract; Valuation of Concessioner's Possessory Interest; Leasehold Surrender Interest; Statutory Interpretation; Contract Interpretation; Implied–in–Fact Contract.

## OPINION

HORN, J.

### FINDINGS OF FACT and STATUTORY FRAMEWORK

Plaintiff, Seven Resorts, Inc. (Seven Resorts), asserts a claim for compensation aris-

ing under a United States Department of Interior, National Parks Service (NPS) concessions contract, which authorized Seven Resorts to conduct operations at the Boulder Beach Site, Lake Mead National Recreation Area, Nevada. The facts relevant to the above captioned case, including decisions by the government agency regarding the property and site involved, have developed and evolved over time, although appear, at this point in time, sufficiently stable to allow for a decision in the case.[1]

On August 14, 1974, pursuant to the National Park System Concessions Policy Act (the 1965 Concessions Act), Pub.L. No. 89–249, 79 Stat. 969 (Oct. 9, 1965) (repealed 1998), NPS entered into concessions Contract No. CC–LAME003–74 (the original concessions contract) with Leisurama, Inc. (Leisurama). The original concessions contract provided Leisurama with a possessory interest in improvements created under the contract pursuant to the following provision: "It is the intention of the parties that the Concessioner shall have a possessory interest in all concessioner's improvements consisting of all incidents of ownership, except legal title which shall be vested in the United States." On July 1, 1975, Leisurama assigned the original concessions contract to Lake Mead Enterprises, Inc. On March 14, 1979, Lake Mead Enterprises, Inc. assigned the original concessions contract to an entity identified as Lake Mead Resort. The parties have stipulated that the original concessions contract and its corresponding possessory interest were subsequently assigned to Seven Resorts in 1987. Under section 2 of the original concessions contract, Seven Resorts was authorized "to provide accommodations, facilities, and services for the public at the Boulder Beach Site within Lake Mead National Recreation Area," including the provision of marina and lodging facilities. Specifically, section 2 of the original concessions contract authorized:

1. Marine services, including: Boat docks and slips, boat repair and mooring service, rental of boats and motors, fueling facilities, and unscheduled charter service (boat and pilot).

2. Food and beverage service facilities, including on and off sale of liquor, beer, and wine.

3. Marine and general merchandising facilities.

4. Dry boat storage area.

5. Lodging facilities and services.

6. Any and all services and facilities which are customary in connection with such operations.

The original concessions contract had a twenty-five year term, from January 1, 1973 to December 31, 1997. The original concessions contract, at section 12(b), also contained a clause that allowed for a continuation of operations after the expiration of the original concessions contract's term. The continuation clause stated in relevant part:

> To avoid interruption of service to the public upon the termination of this contract for any reason, the Concessioner, upon the request of the Secretary, will (1) continue to conduct the operations authorized hereunder for a reasonable time to allow the Secretary to select a successor, or (2) consent to the use by a temporary operator designated by the Secretary of the concessioner's improvements and personal property. . . .

NPS invoked the continuation clause at various points after the expiration of the original concessions contract's term on December 31, 1997, purporting to authorize Seven Resorts to continue operations until December 31, 2008.

According to the original concessions contract, Seven Resorts had a possessory interest in "all concessioner's improvements," which included "buildings, structures, fixtures, equipment, and other improvements. . . ." The original concessions contract further provided that Seven Resorts' possessory interest in these improvements could not "be extinguished by the expiration or other termination of this contract, and may not be terminated or taken[2] for public

---

**1.** Both parties have cross-moved for partial summary judgment, although, at various times through the life of this case, the defendant has argued that the case was not ripe for disposition.

**2.** Although the original concessions contract refers to a taking of Seven Resorts' possessory

use without just compensation." The original concessions contract described how to value "just compensation" for the termination or "taking" of Seven Resorts' possessory interest in two circumstances, by payment of either "sound value" or "book value." Specifically, section 12(a) of the original concessions contract provided:

> (a)(1) If for any reason, the Concessioner shall cease to be authorized to conduct the operations authorized hereunder, or any of them, and thereafter such operations are to be conducted by a successor, whether a private person or an agency of the government ... the Secretary will require such successor, as a condition to the granting of a permit or contract to operate, to purchase from the Concessioner such possessory interest and other property, and to pay the Concessioner the fair value thereof. The fair value of a possessory interest shall be deemed to be the *sound value* of the improvement to which it relates at the time of transfer of such possessory interest, without regard to the term of the contract. The sound value of any structure, fixture, or improvement shall be determined upon the basis of reconstruction cost less depreciation evidenced by its condition and prospective serviceability in comparison with a new unit of like kind, but not to exceed fair market value....

> (2) If the Secretary shall determine that, during the term of this contract or upon its termination for any reason, it is desirable to discontinue the operations authorized hereunder, or any of them, and/or to abandon, remove, or demolish any of the concessioner's improvements, then the Secretary will, before making such determination effective, take such action as may be necessary to assure the Concessioner of compensation ... for its possessory interest in such improvements in the amount of their *book value,* provided that is such an improvement is to be replaced by the Concessioner then such compensation shall be the sound value thereof determined as provided in subsection (a)(1) of this section....

(emphasis added; indentation in original). Under section 12(a), therefore, if NPS discontinued Seven Resorts operations and subsequently authorized the continuation of those operations by a successor contractor, Seven Resorts was to receive sound value for its possessory interest. If there was no successor to Seven Resorts, and the Secretary[3] made a determination to discontinue operations during the original concessions contract's term, or "upon its termination for any reason," Seven Resorts was to receive book value for its possessory interest. The original concessions contract also provided that "[p]erformance of the obligations assumed by the Secretary under Section 12 herein shall constitute just compensation *in the circumstances therein described,"* indicating that section 12(a) did not necessarily provide the exclusive method of measuring just compensation in the event Seven Resorts made a possessory interest claim. (emphasis added).

As a result of the discontinuation of Seven Resorts' operations, on December 31, 2008, Seven Resorts seeks sound value for its pos-

interest created under the original concessions contract, claims relating to possessory interests created under contract are generally interpreted to allege a breach of contract, rather than a compensable taking under the Fifth Amendment to the United States Constitution. *See Schoeffel v. United States,* 193 Ct.Cl. 923, 936 (1971) (per curiam); *see also Bishop v. United States,* 164 Ct.Cl. 717, 722 (1964) (per curiam) ("In substance, the plaintiff's claim is based solely upon the loss of the right to operate the lodges. That right was not taken from him by the Government."); *Barren Island Marina, Inc. v. United States,* 44 Fed.Cl. 252, 255, 258 (1999) (analyzing the plaintiff's claim under the parties' contract and applicable statutory provisions, rather than the Fifth Amendment to the United States Consti-

tution), *appeal dismissed,* 54 Fed.Appx. 329 (Fed. Cir.), *and appeal dismissed,* 66 Fed.Appx. 878 (Fed.Cir.2003). In this case, Seven Resorts explicitly claims entitlement to compensation based on NPS' alleged breach of the original concessions contract, rather than an alleged Fifth Amendment taking of Seven Resorts' possessory interest.

**3.** Although the Secretary's authority relating to concessions contracts generally has been delegated to subordinate NPS officials, this opinion generally refers to "the Secretary" when discussing NPS' authority under the terms of the original concessions contract and applicable statutes and regulations.

sessory interests in the lodging facilities[4] constructed under the original concessions contract (Lake Mead Lodge), which include:

> the lodge structure and all of its associated improvement including but not limited to the office and conference building, swimming pool, utilities such as electric and sewers, sidewalks, fencing, landscaping; and the fuel system, including but not limited to the utility chase and equipment, sewage lift pump, digging costs and a Nevada Environmental Upgrade.

Seven Resorts asserts that NPS breached the terms of the original concessions contract by refusing to compensate Seven Resorts using sound value to value its possessory interest. Based perhaps, in part, on the continuous uncertainty over whether NPS would authorize continued operations at the Boulder Beach Site following Seven Resorts removal, and even after Seven Resorts filed its complaint, plaintiff has advanced different arguments at various times as to why it is entitled to sound value for its possessory interest under the original concessions contract. Seven Resorts' complaint alleges that it is entitled to sound value for its possessory interest in Lake Mead Lodge "[p]ursuant to the terms of the Contract and the 1965 Concessions Act, 16 U.S.C. § 20e...." In its motion for partial summary judgment, however, Seven Resorts argues that it is entitled to sound value either pursuant to the terms of the original concessions contract or the National Park Service Concessions Management Improvement Act of 1998 (the 1998 Concessions Act), Pub.L. No. 105–391, Title IV, 112 Stat. 3503 (1998) (codified as amended at 16 U.S.C. §§ 5951–66 (2006)). The 1965 Concessions Act and the 1998 Concessions Act are described more fully below. In a supplemental brief, Seven Resorts most recently argued that it is entitled to sound value under the original concessions contract, the 1965 Concessions Act, and the 1998 Concessions Act.

Defendant, however, argues that Seven Resorts is entitled to book value for its possessory interest under the terms of the origi-nal concessions contract. According to defendant, "the only factor that determines whether book value, as opposed to sound value, constitutes the measure of compensation in a given case is the presence or absence of a successor concessioner." Because a successor concessioner has not continued the operations that Seven Resorts conducted under the original concessions contract, defendant argues that Seven Resorts' possessory interest must be measured by book value. The parties have filed cross-motions for partial summary judgment on the issue of the proper method of valuation of Seven Resorts' possessory interest.

*Statutory Framework*

The 1965 Concessions Act, under which the original concessions contract between the parties was executed, provided that a concessioner was entitled to a possessory interest in improvements constructed pursuant to a concessions contract entered into under the Act:

> A concessioner who has heretofore acquired or constructed or who hereafter acquires or constructs, pursuant to a contract and with the approval of the Secretary, any structure, fixture, or improvement upon land owned by the United States within an area administered by the National Park Service shall have a possessory interest therein, which shall consist of all incidents of ownership except legal title, and except as hereinafter provided, which title shall be vested in the United States.

§ 6, 79 Stat. at 970. Similar to the terms of the original concessions contract, which follows the statutory framework of the 1965 Concessions Act, the 1965 Concessions Act provided that a concessioner's possessory interest "shall not be extinguished by the expiration or other termination of the contract and may not be taken for public use without just compensation." *Id.* The 1965 Concessions Act provided that the default valuation of "just compensation" for a concessioner's possessory interest was sound value, using the same language to define sound value as was included in the original concessions con-

---

4. As indicated below, Seven Resorts sold the marina facilities it operated under the original concessions contract to another concessioner. Seven Resorts' possessory interest as it relates to the marina facilities, therefore, is not at issue in the above-captioned case.

tract entered into between the parties in this case:

> Unless otherwise provided by agreement of the parties, just compensation shall be an amount equal to the sound value of such structure, fixture, or improvement at the time of taking by the United States determined upon the basis of reconstruction cost less depreciation evidenced by its condition and prospective serviceability in comparison with a new unit of like kind, but not to exceed fair market value.

§ 6, 79 Stat. at 970–71.

On November 13, 1998, the 1965 Concessions Act was repealed and replaced in relevant part by the 1998 Concessions Act. *See* Title IV, 112 Stat. at 3503–18. The 1998 Concessions Act, however, contains a savings clause that preserves the terms of concessions contracts entered into under the 1965 Concessions Act:

> Public Law 89–249 (commonly known as the National Park Service Concessions Policy Act; 16 U.S.C. [sic] 20 et seq.) [the 1965 Concessions Act] is repealed. The repeal of such Act shall not affect the validity of any concessions contract or permit entered into under such Act, but the provisions of this title shall apply to any such contract or permit except to the extent such provisions are inconsistent with the terms and conditions of any such contract or permit.

§ 415(a), 112 Stat. at 3515–16 (codified at 16 U.S.C. § 20 note).

The 1998 Concessions Act generally requires that any "new concessions contract (including renewals or extensions of existing concessions contracts)" be awarded pursuant to a public solicitation:

> Except as otherwise provided in this section, all proposed concessions contracts

shall be awarded by the Secretary to the person, corporation, or other entity submitting the best proposal, as determined by the Secretary through a competitive selection process....

Except as otherwise provided in this section, prior to awarding a new concessions contract (including renewals or extensions of existing concessions contracts) the Secretary shall publicly solicit proposals for the concessions contract and, in connection with such solicitation, the Secretary shall prepare a prospectus and shall publish notice of its availability at least once in local or national newspapers or trade publications, and/or the Commerce Business Daily, as appropriate, and shall make the prospectus available upon request to all interested parties.

§ 403(1), (2), 112 Stat. at 3504 (codified at 16 U.S.C. § 5952(1), (2) (2006)).

Section 403(11)(A) of the 1998 Concessions Act provides a relevant exception to the general requirement that new concessions contracts be awarded pursuant to a public solicitation:

> EXCEPTIONS.—Notwithstanding the provisions of this section, the Secretary may award, without public solicitation, the following:
>
> (A) A temporary concessions contract or an extension of an existing concessions contract for a term not to exceed 3 years in order to avoid interruption of services to the public at a unit of the National Park System, except that prior to making such an award, the Secretary shall take all reasonable and appropriate steps to consider alternatives to avoid such interruption.

§ 403(11)(A), 112 Stat. at 3507–08 (codified at 16 U.S.C. § 5952(11)(A)).[5] NPS subsequent-

---

5. Section 403(11)(B) of the 1998 Concessions Act also provides that the Secretary may award a concessions contract without public solicitation "in extraordinary circumstances where compelling and equitable considerations require the award of a concessions contract to a particular party in the public interest." *See* § 403(11)(B), 112 Stat. at 3508 (codified at 16 U.S.C. § 5952(11)(B)). Neither party alleges that the Secretary invoked this authority in the above-captioned case. This exception contains a significant limitation:

> [A]ward of a concessions contract shall not be made by the Secretary until at least 30 days after publication in the Federal Register of notice of the Secretary's intention to do so and the reasons for such action, and submission of notice to the Committee on Energy and Natural Resources of the Senate and the Committee on Resources of the House of Representatives. *Id.*

ly adopted regulations implementing the 1998 Concessions Act, which limited the apparent scope of section 403(11)(A) by indicating that the Secretary can award temporary concessions contracts "for consecutive terms not to exceed three years *in the aggregate...*" or extensions to existing concessions contracts "for additional terms not to exceed three years *in the aggregate ....*" 65 Fed.Reg. 20,630–01, 20,673 (Apr. 17, 2000) (emphasis added) (codified at 36 C.F.R. §§ 51.23, 51.24 (2013)).

In addition to generally requiring that new concessions contracts be awarded pursuant to a public solicitation, the 1998 Concessions Act provides concessioners with a "leasehold surrender interest," rather than a possessory interest, in improvements constructed under a concessions contract after the passage of the 1998 Concessions Act. § 405(a), 112 Stat. at 3508 (codified at 16 U.S.C. § 5954(a)). When a concessioner has already obtained a possessory interest in improvements constructed under the 1965 Concessions Act, the 1998 Concessions Act provides that the concessioner's possessory interest is: (1) valued under the terms of the a concessions contract entered into before the "date of enactment" of the 1998 Concessions Act, or the laws in effect before the effective date of the 1998 Concessions Act when the concessioner's "possessory interest is not described in the existing contract," or (2) converted into a leasehold surrender interest if the concessioner is "awarded a new concessions contract ... replacing an existing concessions contract" after the effective date of the 1998 Concessions Act. § 405(b), 112 Stat. at 3509 (codified at 16 U.S.C. § 5954(b)). Specifically, section 405(b) of the 1998 Concessions Act provides:

(b) SPECIAL RULE FOR EXISTING POSSESSORY INTEREST.—

(1) A concessioner which has obtained a possessory interest as defined pursuant to Public Law 89–249 (commonly known as the National Park Service Concessions Policy Act; 16 U.S.C. 20 et seq.), [the 1965 Concessions Act] as in effect on the day before the date of the enactment of this Act, [the 1998 Concessions Act] under the terms of a concession contract entered into before that date [the date of the 1998 Concessions Act's enactment] shall, upon the expiration or termination of such contract, be entitled to receive compensation for such possessory interest improvements in the amount and manner as described by such concessions contract. Where such a possessory interest is not described in the existing contract, compensation of possessory interest shall be determined in accordance with the laws in effect on the day before the date of enactment of this Act.

(2) In the event such prior concessioner is awarded a new concessions contract after the effective date of this title replacing an existing concessions contract, the existing concessioner shall, instead of directly receiving such possessory interest compensation, have a leasehold surrender interest in its existing possessory interest improvements under the terms of the new contract and shall carry over as the initial value of such leasehold surrender interest (instead of construction cost) an amount equal to the value of the existing possessory interest as of the termination date of the previous contract. In the event of a dispute between the concessioner and the Secretary as to the value of such possessory interest, the matter shall be resolved through binding arbitration.

*Id.*

*The Parties' Relationship after the Expiration of the Original Concessions Contract*

The original concessions contract, with its twenty-five year term, expired on December 31, 1997. Through a series of successive Letter Authorizations, NPS purported to authorize Seven Resorts to continue to conduct operations at the Boulder Beach Site for eleven, one-year periods from January 1, 1998 to December 31, 2008. The history of the parties' relationship under these Letter Authorizations is complicated by NPS' reliance on one of two apparent sources of authority to issue the various Letter Authorizations. The effect of each Letter Authorization on the parties' relationship is further complicated by the fact that NPS issued the first Letter Authorization after the expiration of the original concessions contract's term and subsequently issued a

number of the Letter Authorizations after a previous Letter Authorization had expired.

Following the expiration of the original concessions contract's term on December 31, 1997, NPS issued an "Interim Letter of Authorization" to Seven Resorts (the 1998 Letter Authorization), which purported to authorize Seven Resorts to continue to conduct operations from January 1, 1998 through December 31, 1998. The 1998 Letter Authorization was dated March 18, 1998 and accepted by Seven Resorts on March 23, 1998. The 1998 Letter Authorization stated that "this letter shall, upon acceptance by you as evidenced by your execution hereof, constitute authorization to continue services and operations pursuant to the terms and conditions set forth in Concession Contract No. CC–LAME003–74 [the original concessions contract]." Although not apparent from the face of the 1998 Letter Authorization, the parties agree that the 1998 Letter Authorization was issued pursuant to the continuation clause located at section 12(b) of the original concessions contract.[6]

The 1998 Concessions Act was enacted on November 13, 1998 while Seven Resorts was conducting operations pursuant to the 1998 Letter Authorization. On December 11, 1998, NPS sent a second Letter Authorization to Seven Resorts (the 1999 Letter Authorization), stating that NPS would be unable to enter any new, long-term concessions contracts "until final adoption of new concession contracting regulations in accordance with the new law." Accordingly, NPS issued the 1999 Letter Authorization "pursuant to section 403(11) of P.L. 105–391 [the 1998 Concessions Act]," [7] explaining that, "upon return of a signed copy of this letter agreement to the undersigned, your Concession Contract No. CC–LAME003–74 and Concession Contract No. CC–LAME–010–71 [8] are hereby extended to December 31, 1999." 1999 Letter Authorization also stated that "[a]ll other terms and conditions of the contract will remain the same, subject to the terms of P.L. 105–391 [the 1998 Concessions Act]." The President of Seven Resorts signed, and accepted, the 1999 Letter Authorization on December 31, 1998. Although plaintiff indicates that the 1999 Letter Authorization "was effective as of January 1, 1999," plaintiff admits that the record does not reveal when the 1999 Letter Authorization was returned to NPS. Plaintiff maintains that, "[i]n all likelihood and based on plaintiff's normal course of business in such situations, the letter was placed in the U.S. mail (first class delivery) on Thursday, December 31, 1998 and would not have been received by NPS until Monday, January 4, 1999 at the earliest," which was after the expiration of the 1998 Letter Authorization. In response to the court's inquiries relating to the effective date of the 1999 Letter Authorization, defendant produced an internal NPS document that tracked the receipt of various Letter Authorizations, which confirms that NPS received a signed copy of the 1999 Letter Authorization on January 7, 1999, after the expiration of the 1998 Letter Authorization.

For the next two years, NPS issued two, similar letters to Seven Resorts, stating that: "Concession Contract No. CC–LAME003–74 [the original concessions contract] and Con-

---

**6.** As indicated above, section 12(b) of the original concessions contracts provided: "To avoid interruption of service to the public upon the termination of this contract for any reason, the Concessioner, upon the request of the Secretary, will (1) continue to conduct the operations authorized hereunder for a reasonable time to allow the Secretary to select a successor, or (2) consent to the use by a temporary operator designated by the Secretary of the concessioner's improvements and personal property . . . ."

**7.** As indicated above, section 403(11)(A) of the 1998 Concessions Act provides in relevant part: EXCEPTIONS—Notwithstanding the provisions of this section, the Secretary may award, without public solicitation, the following:

(A) A temporary concessions contract or an extension of an existing concessions contract for a term not to exceed 3 years in order to avoid interruption of services to the public at a unit of the National Park System, except that prior to making such an award, the Secretary shall take all reasonable and appropriate steps to consider alternatives to avoid such interruption.

§ 403(11)(A), 112 Stat. at 3507–08.

**8.** Contract No. CC–LAME010–71 relates to Seven Resorts' operations at Echo Bay Resort, which are not at issue in the above-captioned case.

cession Contract No. CC–LAME010–71 are hereby extended" pursuant to section 403(11) of the 1998 Concessions Act. The first of the two letters (the 2000 Letter Authorization) was dated November 22, 1999 and signed by Seven Resorts' President on December 2, 1999. Plaintiff maintains that, "[i]n all likelihood and based on plaintiff's normal course of business in such situations," the 2000 Letter Authorization was likely received by NPS on December 8, 1999, before the expiration of the 1999 Letter Authorization. The second of the two letters (the 2001 Letter Authorization) was dated January 2, 2001 and signed by Seven Resorts' President on January 18, 2001, after the expiration of the 2000 Letter Authorization. The 2000 and 2001 Letter Authorizations respectively authorized Seven Resorts to continue operations to December 31, 2000 and December 31, 2001. Similar to the 1999 Letter Authorization, the 2000 and 2001 Letter Authorizations stated that "[a]ll other terms and conditions of the contracts will remain the same, subject to the terms of" the 1998 Concessions Act.

By December 31, 2001, having relied on section 403(11) of the 1998 Concessions Act as the basis for its authority to issue the 1999, 2000, and 2001 Letter Authorizations, NPS had exhausted the three-year, aggregate window provided by the NPS implementing regulations. *See* 36 C.F.R. §§ 51.23, 51.24 (2001); *see also* § 403(11), 112 Stat. at 3507–08. NPS continued to authorize Seven Resorts to continue operations, but, once again, relied on the continuation clause located at section 12(b) of the original concessions contract as authority to issue subsequent Letter Authorizations. On December 31, 2001, NPS sent Seven Resorts a fifth letter (the 2002 Letter Authorization) providing for another, one-year "continuation of operations" to December 31, 2002, "under the terms and conditions of your current contract, as amended," apparently with reference to the original concessions contract, No.

CC–LAME003–74.[9] The 2002 Letter Authorization stated that it was issued "under the provisions of your current concession contract number that provide for your continuation of operations for a reasonable period of time after expiration...." Unlike the previous Letter Authorizations, the 2002 Letter Authorization did not explicitly state that it would become effective upon Seven Resorts' acceptance of the Letter Authorization, stating only that Seven Resorts was to "indicate ... receipt of this authorization by signing this letter in the space provided below and returning a fully executed copy of this letter to this office no later than 30 days upon receipt of this letter." Under the heading, "Accepted," the President of Seven Resorts signed the 2002 Letter Authorization on January 3, 2002.

After issuing the 2002 Letter Authorization, NPS sent six additional, consecutive continuation letters to Seven Resorts in successive years, authorizing Seven Resorts to continue operations pursuant to section 12(b) of the original concessions contract, with Seven Resorts indicating its acceptance of each continuation through the signature of its President.

In a letter date stamped January 9, 2003 (the 2003 Letter Authorization),[10] with the subject "Re. Concession Contract No. CC–LAME003–74," NPS stated:

> [U]nder the provisions of your current concession contract that provide for your continuation of operations for a reasonable period of time after expiration, the National Park Service hereby authorizes you to continue operation of visitor services for a period not to exceed 1 year, until December 31, 2003, under the terms and conditions of your current contract, as amended.

Like the 2002 Letter Authorization, the 2003 Letter Authorization did not expressly state that it became effective upon Seven

9. The subject line of the 2002 Letter Authorization includes a reference to "CC–LAME003–74," but a handwritten interlineation of "71" appears over the typewritten "74." Notwithstanding this interlineation, the parties have treated the 2002 Letter Authorization as relating to Seven Resorts' operations under the contract at issue in the above-captioned case, No. CC–LAME003–74.

10. The date stamped on the 2003 Letter Authorization is partially illegible in the copy of the 2003 Letter Authorization provided to the court. The parties agree, however, that the date that appears on the 2003 Letter Authorization is January 9, 2003.

Resorts' acceptance of the 2003 Letter Authorization, but the 2003 Letter Authorization contains the undated signature of Seven Resorts' President under the heading "Accepted."

In a letter stamped January 6, 2004 (the 2004 Letter Authorization), with the subject "Re. Concession Contract No. CC–LAME003–74 (Lake Mead Resort)," NPS stated that it "hereby authorizes you to continue operation of . . . services until December 31, 2004, or until such time as a new contract is awarded, whichever occurs first." The 2004 Letter Authorization explicitly referred to "Section 12(b) of your current contract, as amended" as authority for the Letter Authorization. Like the 2002 and 2003 Letter Authorizations, the 2004 Letter Authorization did not directly request Seven Resorts' acceptance of the Letter Authorization, but the undated signature of Seven Resorts' President appears under the heading "Accepted."

In a letter stamped December 23, 2004 (the 2005 Letter Authorization), and signed by Seven Resorts' President on December 29, 2004 under the heading "Accepted," NPS stated:

Pending the development of a prospectus from a new concession contract covering the visitor services you were currently providing Lake Mead National Recreation Area under concession contract CC–LAME003–74, the National Park Service hereby authorizes you to continue operation of . . . services through December 31, 2005 or until such time as a new concession contract is awarded, whichever occurs first.

Unlike the 2002, 2003, and 2004 Letter Authorizations, the 2005 Letter Authorization explicitly referred to Seven Resorts' "acceptance of this authorization" and instructed Seven Resorts' President to "indicate your acceptance of this authorization by signing below on the acceptance line and returning same copy to this office. The 2005 Letter Authorization did not describe the authority on which NPS relied to authorize Seven Resorts to continue operations, indicating only that "[t]he terms and conditions of the concession contract remain the same." The

2005 Letter Authorization was the first Letter Authorization to use the past tense with reference to Seven Resorts' operations under the original concessions contract.

In a letter stamped December 27, 2005 (the 2006 Letter Authorization), and signed by Seven Resorts' President on January 3, 2006 under the heading, "Accepted by," NPS stated:

Pending the development of a prospectus for a new concession contract covering the visitor services you were currently providing Lake Mead National Recreation Area under the concession contract CC–LAME003–74, the National Park Service hereby authorizes you to continue operation of services through December 31, 2006 or until such time as a new concession contract is awarded, whichever occurs first.

Like the 2005 Letter Authorization, the 2006 Letter Authorization directly referred to Seven Resorts' "acceptance of this authorization" and directed Seven Resorts' President to "indicate your acceptance of this authorization by signing below on the acceptance line and returning the same copy to this office," but did not indicate on which authority NPS relied to authorize plaintiff's continued operations.

In an undated letter (the 2007 Letter Authorization), with the subject "Re: National Park Service Concessions Contract LAME003–74," and signed by Seven Resorts' President on January 17, 2007 under the heading "Accepted," NPS stated that, "[u]nder the provisions of your concession contract and pending the completion of the public solicitation of a prospectus for a new concession contract, the National Park Service hereby authorizes the continuation of visitor services for a period not-to-exceed one year under the terms and conditions within the concession contract." Like the 2005 and 2006 Letter Authorizations, the 2007 Letter Authorization directly referred to Seven Resorts' "acceptance of this authorization." The 2007 Letter Authorization, however, slightly modified the directions given to Seven Resorts' President in the 2005 and 2006 Letter Authorizations: "Please indicate your acceptance of this authorization to continue

to provide visitor services by signing in the space provided below *and return* the fully-executed letter to this office within 30 days of receipt." (emphasis added).

After NPS issued the 2007 Letter Authorization, in a letter dated July 5, 2007, NPS informed Seven Resorts that certain facilities and services at the Boulder Beach Site would be "discontinued," and associated improvements "abandoned." The July 5, 2007 letter was signed by William K. Dickinson, the Superintendent of the Lake Mead National Recreation Area. The July 5, 2007 letter stated, in part:

> This letter addresses certain changes in visitor services that Seven Crown Resorts, Inc. doing business as Lake Mead Resort ("Lake Mead Resort")[11] currently is authorized to provide at Boulder Harbor, within Lake Mead National Recreation Area (the "Park"). These changes include discontinuation of certain authorized visitor services and the possible purchase and sale of various assets used in concession operations.
>
> Lake Mead Resort initially was authorized to provide visitor services pursuant to National Park Service Concession Contract No. CC–LAME 003–74 ("Contract"). This authorization since has been extended and continued, to avoid interruption of visitor services pending selection of a successor concessioner, and currently is on the terms and conditions of the Contract.
>
> Visitor services at Boulder Harbor are being affected by a number of different changes in Park resources and values and in public use and enjoyment of the Park. For example, water levels in Lake Mead have dropped and continue to lower significantly. These low-water conditions eventually will affect, among other things, the safe use of water-based operations at the Lake Mead Resort. At the same time, there have been changes in visitor use patterns at the Park as well as growth in public accommodations, facilities and services located outside of the Park but available to Park visitors. These latter examples of changes have already af-

fected certain of the land-based operations at Lake Mead Resort and may affect other operations as well.

> Due to these changes, the National Park Service has determined that certain authorized visitor services at Boulder Harbor should be discontinued and the improvements used to provide these services should be abandoned. The first service to be discontinued and associated improvement to be abandoned is that of lodging facilities and services, which currently are provided at the Lake Mead Lodge. These specific shore-side services will be discontinued effective upon the date noted in the below mentioned three-party settlement agreement. Other discontinuations also may be desirable, depending upon how changes in conditions continue to unfold.
>
> Under its authorization to continue visitor services, Lake Mead Resort is entitled in the event of a discontinuation of service to compensation for certain interests that it may have in the improvements to be abandoned. Lake Mead Resort has possessory interest ("Possessory Interest") in certain structures, fixtures or improvements that Lake Mead Resort has acquired or constructed within the Park pursuant to the Contract and with the approval of the National Park Service (collectively, the "Assets"). Possessory Interest entitles Lake Mead Resort to just compensation for the Assets in the amount agreed to in Section 12 of the Contract.

In the event of a discontinuation of operations, Section 12(a)(2) specifies the amount of just compensation due as that "in the amount of their book value, provided that is [sic] such an improvement is to be replaced by the Concessioner then such compensation shall be the sound value there of [sic] determined as provided in" Section 12(a)(1) of the contract. As Lake Mead Lodge simply is to be discontinued, compensation will be at book value, and the National Park Service requests that you promptly provide the Park with the amount that Lake Mead Resort asserts is the book value for Lake Mead Lodge and with sufficient documentation to

---

11. It appears that Seven Resorts was doing business as Seven Crown Resorts, Inc. and Lake Mead Resort during the time period relevant to the above-captioned case.

support the amount asserted as being "book value" within the meaning of Section 12(a)(2). (first error noted in original).

The July 5, 2007 letter notified Seven Resorts that visitor services at the Boulder Beach Site would be discontinued on the basis of low water levels at Lake Mead, changes in visitor use, and the growth of competing facilities and services outside of the Lake Mead National Recreation Area. The letter indicated that NPS envisioned that Seven Resorts would discontinue operations at Lake Mead Lodge and that the marina facilities would be sold to a successor contractor.[12] The July 5, 2007 letter also served as a precursor to NPS' position in the above-captioned case that book value should be used to calculate the appropriate value of plaintiff's possessory interest in Lake Mead Lodge.

With regard to NPS' reference to the possibility that Seven Resorts would sell its interest in the marina facilities to a successor concessioner, the July 5, 2007 letter stated:

In a separate but related development, the National Park Service has been informed that Lake Mead Resort is discussing with Las Vegas Boat Harbor, Inc. ("LVBH") the possible purchase by LVBH for use as part of its concession operations at Hemenway Harbor in the Park certain items and equipment. To the extent that any of those items and equipment are Assets, the United States has title to them, and any actions regarding the Assets by Lake Mead Resort are wholly subject to the terms of the Contract and to the laws and regulations relating to the Park.

. . .

The National Park Service, in recognition of a number of factors that are unique to this matter, may be willing—subject to certain conditions—to permit certain Assets currently approved for use by Lake Mead Resort at Boulder Harbor to be used by LVBH to provide visitor services under

the terms of its authorization. The conditions to this possible permission and approval by the National Park Service are generally outlined below, for purposes of discussion. . . . In the event that the following terms and conditions generally are acceptable to Lake Mead Resort and to LVBH, the National Park Service, if the proposed transaction is otherwise acceptable to it, will prepare and forward to Lake Mead Resort and LVBH for review and agreement a three-party settlement agreement between Lake Mead Resort, LVBH and the National Park Service. . . . The general conditions of possible permission and approval include:

1. LVBH and Lake Mead Resort provide the National Park Service with the proposed price at which LVBH will buy certain Assets and information to substantiate to the satisfaction of the National Park Service, any claim by LVBH that the purchase price does not exceed the sound value (as the term is used in the Contract and the LVBH Concession Contract), of that Asset. . . .

Written Agreement by and between the National Park Service and Lake Mead Resort that (a) the Price is just compensation for Possessory Interest, if any, that Lake Mead Resort may have under the Contract or applicable law in the Assets to be purchased and sold; (b) effective as of any sale of such Assets, Lake Mead Resort has no possessory interest under the Contract or applicable law in the Assets to be purchased and sold; and (c) book value is just compensation for any possessory interest under the Contract or applicable law for any and all Assets associated with authorized lodging

12. Seven Resorts' complaint states that Las Vegas Boat Harbor, Inc. was negotiating with Seven Resorts to purchase Seven Resorts' interest "in all the remaining facilities in early 2007," which included Seven Resorts' interest in Lake Mead Lodge. Defendant admits that it was informed that Las Vegas Boat Harbor, Inc. was interested in purchasing Seven Resorts' interest "in the remaining facilities," and that Seven Resorts "removed the lodge structure" from a potential sale, but denies that NPS was informed specifically that Las Vegas Boat Harbor, Inc. was "interested in operating the lodge."

facilities and services (including, without limitation, Lake Mead Lodge) which are to be discontinued;....

Notwithstanding NPS' stated intent to discontinue operations at Lake Mead Lodge in the July 5, 2007 letter, NPS subsequently issued an additional Letter Authorization to Seven Resorts. In a letter stamped December 28, 2007 (the 2008 Letter Authorization),[13] with the subject "Re: National Park Service Concessions Contract No. CC–LAME003–74," and signed by Seven Resorts' President on January 7, 2008 under the heading "Accepted," NPS stated that, "[u]nder the provisions of your concession contract and pending the completion of the public solicitation of a prospectus for a new concession contract, the National Park Service hereby authorizes the continuation of visitor services for a period not-to-exceed one year under the terms and conditions within the concession contract." Like the 2005, 2006, and 2007 Letter Authorizations, the 2008 Letter Authorization referred to Seven Resorts' "acceptance of this authorization." The 2008 Letter Authorization also contained the same instructions to Seven Resorts' President as the 2007 Letter Authorization: "Please indicate your acceptance of this authorization to continue to provide visitor services by signing in the space provided below and return the fully-executed letter to this office within 30 days of receipt."

After the 2008 Letter Authorization expired on December 31, 2008, Seven Resorts ceased operations. The parties have stipulated that Seven Resorts secured Lake Mead Lodge, shut down the facilities, and turned the keys over to NPS. Seven Resorts ultimately sold its interest in the marina facilities that it operated under the original concessions contract to another concessioner. NPS then began a lengthy, years-long process of evaluating what to do with the property and the potential, alternative uses of the Lake Mead Lodge facilities. As this case progressed, defendant repeatedly raised

ripeness issues in response to arguments advanced by Seven Resorts as to the future disposition of Lake Mead Lodge after Seven Resorts was no longer on the property. In response to an indication by Seven Resorts' counsel during oral argument that Seven Resorts no longer intended to pursue arguments related to the future disposition of Lake Mead Lodge, defendant abandoned its long-standing assertion that ripeness was implicated in the above-captioned case.

## DISCUSSION

### Summary Judgment

Rule 56 of the Rules of the United States Court of Federal Claims (RCFC) (2013) is similar to Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) (2013) in language and effect. Both rules provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); Fed.R.Civ.P. 56(a); *see also Alabama v. North Carolina*, 560 U.S. 330, 130 S.Ct. 2295, 2308, 176 L.Ed.2d 1070 (2010); *Hunt v. Cromartie*, 526 U.S. 541, 549, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1325 (Fed.Cir.), *reh'g denied* (Fed. Cir.2010); *Consol. Coal Co. v. United States*, 615 F.3d 1378, 1380 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir.2010), *cert. denied*, —— U.S. ——, 131 S.Ct. 2990, 180 L.Ed.2d 821 (2011); *1st Home Liquidating Trust v. United States*, 581 F.3d 1350, 1355 (Fed.Cir.2009); *Arko Exec. Servs., Inc. v. United States*, 553 F.3d 1375, 1378 (Fed.Cir. 2009); *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1283 (Fed.Cir.2008), *reh'g and reh'g en banc denied*, 556 F.3d 1329 (Fed.Cir.2009); *Moden v. United States*, 404 F.3d 1335, 1342 (Fed.Cir.), *reh'g*

---

**13.** The date stamped on the 2008 Letter Authorization is partially illegible in the copy provided to the court. In response to the court's inquiry regarding the date of the Letter Authorization, plaintiff referred the court to an unsigned copy of the 2008 Letter Authorization, which reflects December 28, 2007 date. The parties have agreed that the date stamped on the 2008 Letter Authorization is December 28, 2007.

*and reh'g en banc denied* (Fed.Cir.2005); *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1370–71 (Fed.Cir.), *reh'g en banc denied* (Fed.Cir.2004), *cert. denied*, 545 U.S. 1139, 125 S.Ct. 2963, 162 L.Ed.2d 887 (2005); *Leggitte v. United States*, 104 Fed.Cl. 315, 317 (2012); *Arrañaga v. United States*, 103 Fed.Cl. 465, 467 (2012); *Cohen v. United States*, 100 Fed.Cl. 461, 469 (2011); *Boensel v. United States*, 99 Fed.Cl. 607, 610 (2011).

A fact is material if it will make a difference in the result of a case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505; see also *Arrañaga v. United States*, 103 Fed.Cl. at 467; *Thompson v. United States*, 101 Fed.Cl. 416, 426 (2011); *Cohen v. United States*, 100 Fed.Cl. at 469. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247–48, 106 S.Ct. 2505; *see also Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257 (Fed.Cir.2001); *Curtis v. United States*, 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied*, 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), *reh'g denied*, 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960); *Gorski v. United States*, 104 Fed. Cl. 605, 609 (2012); *Walker v. United States*, 79 Fed.Cl. 685, 692 (2008).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. 2505; *Schlup v. Delo*, 513 U.S. 298, 332, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *Ford Motor Co. v. United States*, 157 F.3d 849, 854 (Fed.Cir.1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); *Cohen v. United States*, 100 Fed.Cl. at 469–70; *Boensel v. United States*, 99 Fed.Cl. at 611; *Macy Elevator, Inc. v. United* States, 97 Fed.Cl. 708, 717 (2011); *Dick Pacific/GHEMM, JV ex rel. W.A. Botting Co. v. United States*, 87 Fed.Cl. 113, 126 (2009); *Johnson v. United States*, 49 Fed.Cl. 648, 651

(2001), *aff'd*, 52 Fed.Appx. 507 (Fed.Cir. 2002), *and published at* 317 F.3d 1331 (Fed. Cir.2003). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't of Health & Human Servs.*, 998 F.2d 979, 982 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (Fed.Cir. 1993); *Leggitte v. United States*, 104 Fed.Cl. at 317–18. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Rothe Dev. Corp. v. U.S. Dep't of Def.*, 262 F.3d 1306, 1316 (Fed.Cir. 2001); *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1553 n.3 (Fed.Cir.1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

> In appropriate cases, summary judgment saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

*Dehne v. United States*, 23 Cl.Ct. 606, 614–15 (1991) (quoting *Pure Gold, Inc. v. Syntex, (U.S.A.) Inc.*, 739 F.2d 624, 626 (Fed.Cir. 1984)), *vacated on other grounds*, 970 F.2d 890 (Fed.Cir.1992) (citation omitted); *see also Metric Constr. Co. v. United States*, 73 Fed.Cl. 611, 612 (2006).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Takeda Pharm. Co. v. Doll*, 561 F.3d 1372, 1375 (Fed.Cir.

2009); *Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1244 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2007), *cert. denied*, 555 U.S. 812, 129 S.Ct. 38, 172 L.Ed.2d 19 (2008); *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 971 (Fed. Cir.), *reh'g and reh'g en banc denied* (Fed. Cir.2001), *cert. denied*, 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002); *Gen. Elec. Co. v. Nintendo Co.*, 179 F.3d 1350, 1353 (Fed.Cir.1999); *Gonzales–McCaulley Inv. Grp., Inc. v. United States*, 101 Fed.Cl. 623, 629 (2011). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *See Ricci v. DeStefano*, 557 U.S. 557, 586, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587–88, 106 S.Ct. 1348; *Yant v. United States*, 588 F.3d 1369, 1371 (Fed.Cir. 2009), *cert. denied*, —— U.S. ——, 131 S.Ct. 69, 178 L.Ed.2d 23 (2010); *Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co.*, 272 F.3d 1365, 1369 (Fed.Cir.2001), *reh'g and reh'g en banc denied,*293 F.3d 1364 (Fed.Cir.2002), *cert. denied,*539 U.S. 957, 123 S.Ct. 2637, 156 L.Ed.2d 655 (2003); *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d at 1257; *Wanlass v. Fedders Corp.*, 145 F.3d 1461, 1463 (Fed. Cir.), *reh'g denied and en banc suggestion declined* (Fed.Cir.1998); *see also Am. Pelagic Co. v. United States*, 379 F.3d at 1371 (citing *Helifix Ltd. v. Blok–Lok, Ltd.*, 208 F.3d 1339, 1345–46 (Fed.Cir.2000)); *Boensel v. United States*, 99 Fed.Cl. at 611 (" 'The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.' " (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. 2505) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587–88, 106 S.Ct. 1348; *Casitas Mun. Water Dist. v. United States*, 543 F.3d at 1283; *Lathan Co. v. United States*, 20 Cl.Ct. 122, 125 (1990))). "However, once a moving party satisfies its initial burden, mere allegations of a genuine issue of material fact without supporting evidence will not prevent entry of summary judgment." *Republic Sav. Bank, F.S.B. v. United States*, 584 F.3d 1369, 1374 (Fed.Cir. 2009); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247–48, 106 S.Ct. 2505.

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Riley & Ephriam Constr. Co. v. United States*, 408 F.3d 1369, 1371 (Fed.Cir.2005); *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1377 (Fed.Cir.), *reh'g denied* (Fed.Cir. 2002); *Trilogy Commc'ns, Inc. v. Times Fiber Commc'ns, Inc.*, 109 F.3d 739, 741 (Fed. Cir.) (quoting *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied and en banc suggestion declined* (Fed.Cir. 1995)), *reh'g denied and en banc suggestion declined* (Fed.Cir.1997); *Lockwood v. Am. Airlines*, Inc., 107 F.3d 1565, 1569 (Fed.Cir. 1997); *Dana R. Hodges Trust v. United States*, 101 Fed.Cl. 549, 553 (2011). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. 2548; *see also Wavetronix LLC v. EIS Elec. Integrated Sys.*, 573 F.3d 1343, 1354 (Fed.Cir.2009); *Long Island Sav. Bank, FSB v. United States*, 503 F.3d at 1244; *Fla. Power & Light Co. v. United States*, 375 F.3d 1119, 1124 (Fed.Cir.2004); *Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202, 1207 (Fed.Cir. 2001); *Am. Airlines, Inc. v. United States*, 204 F.3d 1103, 1108 (Fed.Cir.2000). However, "a non-movant is required to provide opposing evidence under Rule 56(e) only if the moving party has provided evidence sufficient, if unopposed, to prevail as a matter of law." *Saab Cars USA, Inc. v. United States*, 434 F.3d 1359, 1369 (Fed.Cir.2006).

Even if both parties argue in favor of summary judgment and allege an absence of

genuine issues of material fact, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case, and it does not follow that summary judgment should be granted to one side or the other. *See Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)); *see also Marriott Int'l Resorts, L.P. v. United States,* 586 F.3d 962, 968–69 (Fed.Cir.2009); *B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d 587, 593 (6th Cir.2001); *Atl. Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir.2000); *Chevron USA, Inc. v. Cayetano,* 224 F.3d 1030, 1037 n. 5 (9th Cir.2000), *cert. denied,*532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001); *Bubble Room, Inc. v. United States,* 159 F.3d 553, 561 (Fed.Cir. 1998) ("The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other."), *reh'g denied and en banc suggestion declined* (Fed. Cir.1999); *Allstate Ins. Co. v. Occidental Int'l, Inc.,* 140 F.3d 1, 2 (1st Cir.1998); *Massey v. Del Labs., Inc.,* 118 F.3d 1568, 1573 (Fed.Cir.1997); *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *Rogers v. United States,* 90 Fed.Cl. 418, 427 (2009), *subsequent determination,* 93 Fed.Cl. 607 (2010); *Consol. Coal Co. v. United States,* 86 Fed.Cl. 384, 387 (2009), *aff'd,* 615 F.3d 1378, (Fed.Cir.), *and reh'g and reh'g en banc denied* (Fed.Cir.2010), *cert. denied,* —— U.S. ——, 131 S.Ct. 2990, 180 L.Ed.2d 821 (2011); *St. Christopher Assocs., L.P. v. United States,* 75 Fed.Cl. 1, 8 (2006), *aff'd,* 511 F.3d 1376 (Fed.Cir.2008); *Reading & Bates Corp. v. United States,* 40 Fed.Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration, or, otherwise stated, in favor of the non-moving party. *See First Commerce Corp. v. United States,* 335 F.3d 1373, 1379 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir.2003); *see also DeMarini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1322 (Fed.Cir.2001); *Gart v.*

*Logitech, Inc.,* 254 F.3d 1334, 1338–39 (Fed. Cir.), *reh'g and reh'g en banc denied* (Fed. Cir.2001), *cert. denied,* 534 U.S. 1114, 122 S.Ct. 921, 151 L.Ed.2d 886 (2002); *Oswalt v. United States,* 85 Fed.Cl. 153, 158 (2008); *Telenor Satellite Servs., Inc. v. United States,* 71 Fed.Cl. 114, 119 (2006).

Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. *See B.F. Goodrich Co. v. United States Filter Corp.,* 245 F.3d at 593; *Atl. Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d at 1148; *Allstate Ins. Co. v. Occidental Int'l, Inc.,* 140 F.3d at 2; *Rogers v. United States,* 90 Fed.Cl. at 427; *Reading & Bates Corp. v. United States,* 40 Fed.Cl. at 748.

"Questions of law are particularly appropriate for summary judgment." *Oenga v. United States,* 91 Fed.Cl. 629, 634 (2010) (citing *Dana Corp. v. United States,* 174 F.3d 1344, 1347 (Fed.Cir.1999) ("Summary judgment was appropriate here [in *Dana Corp.*] because no material facts were disputed, many being stipulated, and the only disputed issues were issues of law. Moreover, on each issue one party or the other is entitled to judgment as a matter of law.")); *see also Santa Fe Pac. R.R. v. United States,* 294 F.3d 1336, 1340 (Fed.Cir.2002) ("Issues of statutory interpretation and other matters of law may be decided on motion for summary judgment.").

In the above-captioned case, neither the parties nor the court have identified any material facts in genuine dispute. The questions raised by the parties' cross-motions for partial summary judgment on the proper way to value Seven Resorts' possessory interest under the original concessions contract raise questions of statutory construction and contract interpretation, which are questions of law amenable to resolution through summary judgment. *See Adarbe v. United States,* 58 Fed.Cl. 707, 714 (2003) ("It is proper on a motion for summary judgment for this court to engage in interpretation of contracts and statutes.... Even when the interpretation involves resolving some ambi-

guity in the language of the documents at issue, this court may properly resolve this ambiguity as a matter of law on a motion for summary judgment." (citing *Barsebäck Kraft AB v. United States*, 121 F.3d 1475, 1479–80 (Fed.Cir.1997); *Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed.Cir. 1998))).

*Seven Resorts' Possessory Interest under the 1998 Concessions Act*

The first step in statutory construction is "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)); *see also Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, —— U.S. ——, 132 S.Ct. 1670, 1680, 182 L.Ed.2d 678 (2012) ("We begin 'where all such inquiries must begin: with the language of the statute itself.'" (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989))); *Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 644 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir.2011); *Jimenez v. Quarterman*, 555 U.S. 113, 118, 129 S.Ct. 681, 172 L.Ed.2d 475 (2009) ("As with any question of statutory interpretation, our analysis begins with the plain language of the statute."); *Strategic Hous. Fin. Corp. of Travis Cnty. v. United States*, 608 F.3d 1317, 1323 (Fed.Cir. 2010) ("When interpreting any statute, we look first to the statutory language."). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. at 341, 117 S.Ct. 843 (citing *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992), *and cert. denied* 505 U.S. 1218, 112 S.Ct. 3026, 120 L.Ed.2d 897 (1992); *McCarthy v. Bronson*, 500 U.S. 136, 139, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991)). " 'Beyond the statute's text, the traditional tools of statutory construction include the statute's structure, canons of statutory construction, and legislative history.' " *Bartels Trust for the Benefit of Cornell Univ. ex rel. Bartels v. United States*, 617 F.3d 1357, 1361 (Fed.Cir.) (quoting *Bull v. United States*, 479 F.3d 1365, 1376 (2007)), *reh'g en banc denied* (Fed. Cir.2010); *see also Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 132 S.Ct. at 1680 ("[W]e consider each question [of statutory interpretation] in the context of the entire statute." (citing *Robinson v. Shell Oil Co.*, 519 U.S. at 341, 117 S.Ct. 843)); *Roberts v. Sea–Land Servs., Inc.*, —— U.S. ——, 132 S.Ct. 1350, 1356, 182 L.Ed.2d 341 (2012); *Bush v. United States*, 655 F.3d 1323, 1329 (Fed.Cir.2011), *cert. denied*, —— U.S. ——, 132 S.Ct. 2681, 183 L.Ed.2d 45 (2012).

The initial inquiry into the statutory text ceases "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.' " *Barnhart v. Sigmon Coal Co.*, 534 U.S. at 450, 122 S.Ct. 941 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. at 340, 117 S.Ct. 843); *see also Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 661 F.3d at 644. In interpreting the plain meaning of the statute, it is the court's duty, if possible, to give meaning to every clause and word of the statute. *See Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 489 n. 13, 124 S.Ct. 983, 157 L.Ed.2d 967 (2004) ("It is, moreover, ' "a cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or otherwise insignificant." ' " (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001)))); *Williams v. Taylor*, 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (describing as a "cardinal principle of statutory construction" the rule that every clause and word of a statute must be given effect if possible); *see also Setser v. United States*, —— U.S. ——, 132 S.Ct. 1463, 1470, 182 L.Ed.2d 455 (2012) ("Our decision today follows the interpretive rule they invoke, that we must 'give effect . . . to every clause and word' of the Act." (omission in original) (quoting *United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955))); *Sharp v. United States*, 580 F.3d

1234, 1238 (Fed.Cir.2009). Similarly, the court must avoid an interpretation of a clause or word which renders other provisions of the statute inconsistent, meaningless, or superfluous. *See Duncan v. Walker*, 533 U.S. at 174, 121 S.Ct. 2120 (noting that courts should not treat statutory terms as "surplusage"). "[W]hen two statutes are capable of co-existence, it is the duty of the courts ... to regard each as effective." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976); *see also Xianli Zhang v. United States*, 640 F.3d 1358, 1368 (Fed.Cir.) (citing *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1365 (Fed.Cir.2005)), *reh'g and reh'g en banc denied* (Fed.Cir.2011), *cert. denied,* —— U.S. ——, 132 S.Ct. 2375, 182 L.Ed.2d 1017 (2012); *Hanlin v. United States*, 214 F.3d 1319, 1321 (Fed.Cir.), *reh'g denied* (Fed.Cir. 2000).

When the statute provides a clear answer, the court's analysis is at an end. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. at 450, 122 S.Ct. 941; *see also Arko Foods Int'l, Inc. v. United States*, 654 F.3d 1361, 1364 (Fed.Cir. 2011) (" '[W]here Congress has clearly stated its intent in the language of a statute, a court should not inquire further into the meaning of the statute.' " (quoting *Millenium Lumber Distrib., Ltd. v. United States*, 558 F.3d 1326, 1328 (Fed.Cir.2009), *reh'g denied* (2009)); *Am. Airlines, Inc. v. United States*, 551 F.3d 1294, 1300 (Fed.Cir.2008), *reh'g granted,*319 Fed.Appx. 914 (Fed.Cir.2009). Thus, when the " 'statute's language is plain, "the sole function of the courts is to enforce it according to its terms." ' " *Johnson v. United States*, 529 U.S. 694, 723, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. at 241, 109 S.Ct. 1026 (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917))); *see also Bartels Trust for the Benefit of Cornell Univ. ex rel. Bartels v. United States*, 617 F.3d at 1361 (citing *Sharp v. United States*, 580 F.3d at 1237); *Jimenez v. Quarterman*, 555 U.S. at 118, 129 S.Ct. 681; *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000)); *Candle Corp. of Am. v. U.S. Int'l Trade Comm'n*, 374 F.3d 1087, 1093 (Fed.Cir.2004).

In such instances, the court should not consider "conflicting agency pronouncements" or "extrinsic evidence of a contrary intent." *Weddel v. Sec'y of Dep't of Health & Human Servs.*, 23 F.3d 388, 391 (Fed.Cir.) (noting that courts must not defer to agency interpretation contrary to the intent of Congress evidenced by unambiguous language (citing *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. at 476, 112 S.Ct. 2589; *Darby v. Cisneros*, 509 U.S. 137, 147, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993))), *reh'g denied and en banc suggestion declined* (Fed.Cir.1994); *cf. White v. United States*, 543 F.3d 1330, 1338 (Fed.Cir.2008) ("The agency's interpretation must be rejected both because of the clear language of the regulation and because the interpretation it advocates would result in a regulation that conflicts with the clear language of the statute."). "[O]nly language that meets the constitutional requirements of bicameralism and presentment has true legal authority." *Weddel v. Sec'y of Dep't of Health & Human Servs.*, 23 F.3d at 391 (citing *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983)). " '[C]ourts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point.' " *Shannon v. United States*, 512 U.S. 573, 583–84, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994) (alterations in original) (quoting *Int'l Bhd. of Elec. Workers, Local Union No. 474 v. NLRB*, 814 F.2d 697, 712 (D.C.Cir.1987)). Indeed, in construing a statute, courts " 'must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.' " *Schindler Elevator Corp. v. United States*, —— U.S. ——, 131 S.Ct. 1885, 1891, 179 L.Ed.2d 825 (2011) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009) (internal quotation marks omitted)). Even " '[w]hen terms used in a statute are undefined, we give them their ordinary meaning.' " *Schindler Elevator Corp. v. United States*, 131 S.Ct. at 1891 (quoting *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187, 115 S.Ct. 788, 130 L.Ed.2d 682 (1995)). Consequently, if a statute is plain and unequivocal on its face, there is usually

no need to resort to the legislative history underlying the statute. *See Whitfield v. United States,* 543 U.S. 209, 125 S.Ct. 687, 160 L.Ed.2d 611 ("Because the meaning of [the statute's] text is plain and unambiguous, we need not accept petitioners' invitation to consider the legislative history ...."), *reh'g denied sub nom. Hall v. United States,* 544 U.S. 913, 125 S.Ct. 1606, 161 L.Ed.2d 293 (2005). *But see Chamberlain Grp., Inc. v. Skylink Techs., Inc.,* 381 F.3d 1178, 1196 (Fed.Cir.2004) ("Though 'we do not resort to legislative history to cloud a statutory text that is clear,' *Ratzlaf v. United States,* 510 U.S. 135, 147–48, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), we nevertheless recognize that 'words are inexact tools at best, and hence it is essential that we place the words of a statute in their proper context by resort to the legislative history.'" (quoting *Tidewater Oil Co. v. United States,* 409 U.S. 151, 157, 93 S.Ct. 408, 34 L.Ed.2d 375 (1972))), *reh'g and reh'g en banc denied* (Fed.Cir.2004), *cert. denied,*544 U.S. 923, 125 S.Ct. 1669, 161 L.Ed.2d 481 (2005).

Legislative history may be helpful in certain instances "to shed light on what legislators understood an ambiguous statutory text to mean when they voted to enact it into law." *Bruesewitz v. Wyeth LLC,* — U.S. ——, 131 S.Ct. 1068, 1081–82, 179 L.Ed.2d 1 (2011) (citing *Exxon Mobil Corp. v. Allapattah Servs., Inc.,* 545 U.S. 546, 568, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005); *see also Xianli Zhang v. United States,* 640 F.3d at 1373). Legislative history, however, does not "trump[ ] clear text." *Bartels Trust for the Benefit of Cornell Univ. ex rel. Bartels v. United States,* 617 F.3d at 1361 (citing *Sharp v. United States,* 580 F.3d at 1238; *Coltec Indus., Inc. v. United States,* 454 F.3d 1340 (Fed.Cir.2006); *Glaxo Operations UK Ltd. v. Quigg,* 894 F.2d 392, 396 (Fed.Cir.1990)).

The United States Supreme Court also has held that the specific terms of a statute supersede general terms within that statute or within another statute that would otherwise control. *See Fourco Glass Co. v. Transmirra Prods. Corp.,* 353 U.S. 222, 228–29, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957) ("Specific terms prevail over the general in the same or another statute which otherwise might be controlling." (quoting *D. Ginsberg & Sons v. Popkin,* 285 U.S. 204, 208, 52 S.Ct. 322, 76 L.Ed. 704 (1932))); *see also Bloate v. United States,* 559 U.S. 196, 207, 130 S.Ct. 1345, 176 L.Ed.2d 54 (2010); *Bulova Watch Co. v. United States,* 365 U.S. 753, 761, 81 S.Ct. 864, 6 L.Ed.2d 72 (1961). In addition, the Supreme Court has endorsed "the 'normal rule of statutory construction' that 'identical words used in different parts of the same act are intended to have the same meaning.'" *Gustafson v. Alloyd Co.,* 513 U.S. 561, 570, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (quoting *Dep't of Revenue of Or. v. ACF Indus., Inc.,* 510 U.S. 332, 342, 114 S.Ct. 843, 127 L.Ed.2d 165 (1994)); *see also Kislev Partners, L.P. ex rel. Bahar v. United States,* 84 Fed.Cl. 385, 389, *recons. denied,*84 Fed.Cl. 378 (2008).

Although the original concessions contract was entered into under the 1965 Concessions Act, the 1998 Concessions Act expressly provides that "the provisions of this title shall apply" to contracts entered into under the 1965 Concessions Act, "except to the extent such provisions are inconsistent with the terms and conditions of any such contract or permit." *See* § 415(a), 112 Stat. at 3515. Under the 1998 Concessions Act, "[a] concessioner which has obtained a possessory interest" pursuant to a contract entered into under the 1965 Concessions Act "shall, upon the expiration or termination of such contract, be entitled to receive compensation for such possessory interest improvements in the amount and manner as described by such concessions contract." *See* § 405(b)(1), 112 Stat. at 3509. "Where such a possessory interest is not described in the existing contract," the 1998 Concessions Act provides that "compensation of possessory interest shall be determined in accordance with the laws in effect on the day before the date of enactment of this Act," in this case the 1965 Concessions Act. *See id.*

When a "prior concessioner·is awarded a new concessions contract ... replacing an existing concessions contract" after the enactment of the 1998 Concessions Act, however, the 1998 Concessions Act provides that, "instead of directly receiving such possessory interest compensation," the concessioner's possessory interest is converted into a "lease-

hold surrender interest in its existing possessory interest improvements under the terms of the new contract." § 405(b)(2), 112 Stat. at 3509. The "initial value" of this leasehold surrender interest is "an amount equal to the value of the existing possessory interest as of the termination date of the previous contract." *Id.* If the concessioner and the Secretary disagree over "the value of such possessory interest," which is equivalent to the initial value of the leasehold surrender interest, the 1998 Concessions Act provides that "the matter shall be resolved through binding arbitration." § 403(b)(2), 112 Stat. at 3509.

The 1998 Concessions Act provides that a concessioner's "existing" possessory interest at the time of the termination date of the previous contract sets the "initial value" of a leasehold surrender interest created by receipt of a new concessions contract, replacing an existing concessions contract, after the effective date of the 1998 Concessions Act. *See id.* The 1998 Concessions Act's provision for a leasehold surrender is not "inconsistent" with the terms of an "existing" concessions contract because the 1998 Concessions Act uses the value of a concessioner's possessory interest as determined by the existing concessions contract as the initial value of the leasehold surrender interest created by the award of a new concessions contract. *See* § 415(a), 112 Stat. at 3515. As a preliminary matter, the court must determine whether Seven Resorts was ever "awarded a new concessions contract ... replacing an existing concessions contract" after the effective date of the 1998 Concessions Act in order to determine whether Seven Resorts' possessory interest, whether measured by sound value or book value, was converted into a leasehold surrender interest under the 1998 Concessions Act.[14] The court, therefore, may determine the proper method of valuing Seven Resorts'

possessory interest under the original concessions contract only if Seven Resorts was not "awarded a new concessions contract ... replacing an existing concessions contract" after the effective date of the 1998 Concessions Act. *Id.*

Defendant has consistently maintained that Seven Resorts was not "awarded a new concessions contract ... replacing an existing concessions contract" within the meaning of the phrase as it appears in the 1998 Concessions Act. Defendant initially argued that each Letter Authorization issued to Seven Resorts after the expiration of the original concessions contract's term constituted an "extension" or "continuation" of the original concessions contract, rather than the award of a new contract. Seven Resorts initially agreed with defendant that at least some of the Letter Authorizations constituted valid extensions of the original concessions contract and that Seven Resorts had never been awarded a new concessions contract under the 1998 Concessions Act. After the court asked the parties to address that the 1998 Letter Authorization became effective after the expiration of the original concessions contract's term, and that a number of the Letter Authorizations issued after the passage of the 1998 Concessions Act become effective after the expiration of a previous Letter Authorization, the parties modified their respective positions.

Seven Resorts now offers a number of alternative arguments with respect to whether Seven Resorts was "awarded a new concessions contract ... replacing an existing concessions contract" after the passage of the 1998 Concessions Act. Seven Resorts argues that it continued operations at Lake Mead Lodge after the expiration of the original concessions contract on December 31, 1997, but before the issuance of the 1998 Letter Authorization, pursuant to "a stand-alone im-

14. The court would be required to engage in a similar statutory construction analysis of whether Seven Resorts is entitled to sound value or book value for its possessory interest if the court were to determine that Seven Resorts' possessory interest was converted into a leasehold surrender interest. The value of Seven Resorts' possessory interest would be the "initial value" of its leasehold surrender interest. The court, however,

would lack authority to analyze the value of Seven Resorts' possessory interest with respect to the calculation of Seven Resorts' leasehold surrender interest under the 1998 Concessions Act, because it expressly provides that the value of Seven Resorts' possessory interest, had Seven Resorts obtained a leasehold surrender interest, "shall be resolved through binding arbitration." *See* § 403(b)(2), 112 Stat. at 3509.

plied-in-fact contract which retained only those sections of the original contract that applied to providing continuing 'services and operations'" at Lake Mead Lodge. Seven Resorts maintains that this implied-in-fact contract was either "subsequently confirmed in writing by the 1998 Authorization," or was superseded by the 1998 Letter Authorization, which would constitute a separate agreement. Seven Resorts argues "[t]he facts support the conclusion that plaintiff and NPS reached an unwritten mutual agreement, *before* the original contract expired, that plaintiff was authorized to continue operations after December 31, 1997 pursuant to Section 12(b) of the contract," and that the parties' relationship after the expiration of the original concessions contract represents "a 'classic' example of an implied-in-fact contract." (emphasis in original).

Seven Resorts, however, abandoned its initial argument that at least some of the Letter Authorizations issued after the expiration of the original concessions contract constituted extensions of the original concessions contract, stating, "the original contract had a clear termination date and this date was not amended either before or after the original contract expired.... [W]hen a contract has a clear termination date, it terminates on that date." Although Seven Resorts recognizes that the 1998 Letter Authorization, "for all practical on-the-ground purposes, functioned as an extension of the original contract," Seven Resorts argues that "a careful examination of the facts demonstrates that it was not, legally, an extension of the original contract." According to Seven Resorts, the 1998 Letter Authorization, if it did not constitute an implied-in-fact contract, constituted a "new authorization to allow plaintiff to continue to conduct operations," rather than an extension of the initial termination date of the original concessions contract. In support of this argument, Seven Resorts asserts that the use of the term "Interim" in the 1998 Letter Authorization "demonstrates that the authorization was an authorization for operations *in between* the original and next contract, which would suggest it was intended to be a separate authorization," and that "[t]he use of the term 'Letter of Authorization' also suggests that this authorization was separate

from the original contract ...." (emphasis in original). Seven Resorts also argues that NPS' failure to issue a formal amendment altering the original concessions contract's termination date indicates that the 1998 Letter Authorization was a "new (pre–1998 Concessions Act) contract."

Seven Resorts asserts that, although it may have been awarded a new contract in the form of the 1998 Letter Authorization, the possessory interest created under the original concessions contract continued to exist under the 1998 Letter Authorization because Seven Resorts was not entitled to payment for its possessory interest under either the original concessions contract or the 1965 Concessions Act until the facilities at Lake Mead Lodge had been transferred to another entity or taken over by the government, thereby preventing Seven Resorts' possessory interest from being terminated. Notwithstanding the passage of the 1998 Concessions Act after the issuance of the 1998 Letter Authorization, Seven Resorts argues that it continued to maintain the possessory interest created under the original concessions contract until December 31, 2008, the date on which NPS took possession of the improvements at Lake Mead Lodge. According to Seven Resorts, the 1999 Letter Authorization's reference to a continuation of "'*services* and *operations* pursuant to the terms and conditions set forth in Concession Contract No. CC–LAME003–74'" should be interpreted as an extension of the 1998 Letter Authorization, rather than the original concessions contract. (emphasis in original). Seven Resorts argues it should be an extension of the 1998 Letter Authorization because the original concessions contract had expired on December 31, 1997 and the 1998 Letter Authorization constituted an "existing concessions contract," which NPS was authorized to extend under section 403(11) of the 1998 Concessions Act. Although the parties agree that the 1999 Letter Authorization was received on January 7, 1999, after the expiration of the 1998 Letter Authorization, Seven Resorts alleges that the 1999 Letter Authorization "was effective as of January 1, 1999." Seven Resorts recognizes that, under its interpretation of the facts, the 1998 Letter

Authorization "was extended 'upon return' of a signed copy of the 1999 Authorization," but argues that the 1999 Letter Authorization became effective before its return because it "was accepted, signed by plaintiff and likely placed in the mail before that date."

Seven Resorts concludes that, notwithstanding the issuance of the 1999 Letter Authorization after the effective date of the 1998 Concessions Act, Seven Resorts is entitled to receive compensation for its possessory interest pursuant to 1965 Concessions Act because the 1999 Letter Authorization was an extension of the 1998 Letter Authorization, which Seven Resorts interprets to be a contract that came into existence before the effective date of the 1998 Concessions Act, which was passed on November 13, 1998. Seven Resorts argues, therefore, that neither the 1998 nor 1999 Letter Authorizations constituted a "new concessions contract" under the 1998 Concessions Act.

To the extent that the court determines that the 1999 Letter Authorization constituted "a new concessions contract" under the 1998 Concessions Act, Seven Resorts argues that the "award would not result in the conversion of plaintiff's existing possessory interest to a leasehold surrender interest pursuant to the terms of the 1998 Concessions Act" because "any such new concessions contract *would not be replacing the existing concessions contract which provided plaintiff with its possessory interest.*" (emphasis in original). Seven Resorts argues that, if the 1999 Letter Authorization constituted a new contract issued after the effective date of the 1998 Concessions Act, the 1999 Letter Authorization replaced the 1998 Letter Authorization, which was issued before the passage of the 1998 Concessions Act "simply to authorize plaintiff to stay on site and prevent any interruption to visitor services, while NPS searched for a new concessioner." Seven Resorts, therefore, appears to argue that, although the 1999 Letter Authorization may have replaced an "existing concessions contract" in the form of the 1998 Letter Authorization, the 1999 Letter Authorization did not replace the original concessions contract, thereby making the 1998 Concessions Act's provision for a transformation of a possesso-

ry interest into a leasehold surrender interest inapplicable. Seven Resorts highlights that its possessory interest was established in the original concessions contract, rather than the 1998 Letter Authorization, and that the original concessions contract indicated that Seven Resorts' possessory interest "survived until payment was made." Seven Resorts concludes that, "[b]ecause plaintiff never agreed to or knowingly waived its existing rights as established under its original contract, those rights cannot be deemed to have been changed as a matter of law because that law still states that any such change can only occur pursuant to plaintiff entering into a new contract." Resorts concedes, however, that if the court were to determine that the 1999 Letter Authorization constituted the "award[ ][of] a new contract ... replacing an existing concessions contract," in the form of the original concessions contract, Seven Resorts' possessory interest would have been transformed into a leasehold surrender interest in the value of the improvements, and personal property, at Lake Mead Lodge upon issuance of the 1999 Letter Authorization.

Seven Resorts presents a similar analysis with respect to the remaining Letter Authorizations. With respect to the 2000 Letter Authorization, Seven Resorts argues that "[t]he 2000 [A]uthorization involves the same effective facts as the 1999 Authorization, with the exception that the 2000 Authorization was signed and returned before the prior authorization expired." With respect to the 2001 Letter Authorization, Seven Resorts argues that "the facts demonstrate" that the parties had reached a mutual agreement for Seven Resorts to continue its operations at Lake Mead Lodge before the 2000 Letter Authorization expired, and that the 2001 Letter Authorization "could extend" the 1998 Letter Authorization, which Seven Resorts maintains was extended in the interim by the 1999 and 2000 Letter Authorizations.

With respect to the 2002 Letter Authorization, Seven Resorts argues that the 2002 Letter Authorization "involves the same effective facts" as the 2001 Letter Authorization, "with the exception that the 2002 Authorization could not be an extension under

the 1998 Act due to the fact that the maximum period of extensions available under that law (3 years) had expired." Taking into account that the 2002 Letter Authorization was likely not effective until after the 2001 Letter Authorization had expired, Seven Resorts maintains that the 2002 Letter Authorization was the first "temporary concessions contract," rather than contract extension, that NPS issued to Seven Resorts under section 403(11) of the 1998 Concessions Act. Seven Resorts admits, however, that NPS did not explicitly invoke its authority to award a temporary concessions contract without issuing a public solicitation in the 2002 Letter Authorization, and concedes that the 2002 Letter Authorization "could be viewed as an implied-in-fact contract." Seven Resorts interprets the 2003 and 2004 Letter Authorizations as similarly creating new, temporary concessions contracts or, in the alternative, implied-in-fact contracts, rather than contract extensions.[15] Although interpreting the 2002, 2003, and 2004 Letter Authorizations to be new concessions contracts, Seven Resorts maintains, similar to the 1999 Letter Authorization, that the new contracts created by the 2002, 2003, and 2004 Letter Authorizations "did not replace plaintiff's original contract and therefore did not alter plaintiff's rights under its original contract which entitled it to the sound value of the improvements pursuant to its possessory interest, as determined on the date plaintiff transferred the facilities to another entity or NPS."

Seven Resorts differentiates the 2005, 2006, 2007, and 2008 Letter Authorizations from the 2002, 2003, and 2004 Letter Authorizations, concluding that the 2005, 2006, 2007, and 2008 Letter Authorizations created implied-in-fact contracts because "NPS had used up its maximum three years of tempo-

rary contracts" by December 31, 2004, and had exhausted the number of non-competitive extensions allowed under the 1998 Concessions Act and its implementing regulations. Like the 1999, 2002, 2003, and 2004 Letter Authorizations, however, Seven Resorts concludes that the 2005, 2006, 2007, and 2008 implied-in-fact contracts did not "replace or alter plaintiff's rights under its original [concessions] contract to a possessory interest" because the Letter Authorizations did not replace the contract that created Seven Resorts' possessory interest, the original concessions contract.

Defendant argues that the 1998 Concessions Act's provision for a leasehold surrender interest is not applicable to the facts before the court because the parties never agreed to measure Seven Resorts' possessory interest pursuant to the leasehold surrender interest method of valuation. Defendant asserts, therefore, that "the insertion of leasehold surrender interest as the measure of compensation in this case is both contrary to law and contrary to the intentions of the parties."

In response to the court's inquiries, defendant initially indicated that "Seven Resorts's contract with the Government may not have been validly continued past December 31, 1997, in the first instance" as a result of NPS' failure to issue a public notice as required by the 1965 Concessions Act before issuing the 1998 Letter Authorization. *See* §§ 4, 5, 79 Stat. at 970 ("[T]he Secretary, at any time, in his discretion, may extend or renew a contract or permit, or may grant a new contract or permit to the same concessioner upon the termination or surrender before expiration of a prior contract or permit. Before doing so, however, and before

---

**15.** In adopting the position that NPS could award three, new temporary concessions contracts in the form of the 2002, 2003, and 2004 Letter Authorizations, after extending the 1998 Letter Authorization for three years pursuant to the 1999, 2000, and 2001 Letter Authorizations, Seven Resorts does not address that applicable regulations issued in 2000 provide that "[a] temporary concession contract may not be awarded to continue visitor services provided under an extended concession contract except as permitted by paragraph (b) of this section," which is

inapplicable to the facts before the court. *See* 36 C.F.R. § 51.24 (2000). Under Seven Resorts' interpretation of the facts, NPS likely would have been prohibited from awarding a temporary concessions contract under the 1998 Concessions Act in the form of the 2002, 2003, and 2004 Letter Authorizations without issuing a public solicitation because, according to Seven Resorts, NPS had already extended the 1998 Letter Authorization to the maximum extent possible under the 1998 Concessions Act.

granting extensions, renewals or new contracts ... the Secretary shall give reasonable public notice of his intention so to do ....."); *see also* 36 C.F.R. §§ 51.4, 51.5 (1998). Defendant ultimately concluded, however, that "the parties' uninterrupted performance after December 31, 1997 demonstrates that the parties had agreed to waive the expiration of Contract No. CC–LAME003–74 and to perpetuate their relationship pursuant to the same terms and conditions by which they had abided previously, thus creating an implied-in-fact contract extension." According to defendant, "the only significance of the signing of the March 1998 authorization letter is simply that of converting the parties' implied-in-fact continuation of their contract pursuant to section 12(b) [of the original concessions contract] into an express one." Defendant also argues that, although it could not locate a public notice of NPS' issuance of the 1998 Letter Authorization, and although a failure to issue a notice of the issuance of the 1998 Letter Authorization would have violated the 1965 Concessions Act, this violation did not invalidate the 1998 Letter Authorization's extension of the original concessions contract because it did not deprive NPS of the authority to "continue the parties' contract."

Defendant also argues that, if NPS lacked "the authority to continue the parties' contract," the parties' relationship would not have been governed by a new, implied-in-fact contract.[16] Instead, defendant argues, the parties' relationship would have been governed by a contract implied in law, over which the United States Court of Federal Claims has no jurisdiction. Defendant acknowledges that decisions in both the United States Court of Appeals for the Federal Circuit and the United States Court of Federal Claims have, in limited circumstances, "suggest[ed] that the Court of Federal Claims has some power to award quasi-contractual relief in *quantum meruit*." Defendant maintains, however, that these decisions are "at

odds" with Supreme Court precedent. *See Hercules, Inc. v. United States*, 516 U.S. 417, 423, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) (noting that Tucker Act jurisdiction "extends only to contracts either express or implied in fact, and not to claims on contracts implied in law" (citations omitted)). Defendant also alleges that decisions that recognize quasi-contractual relief are "premised upon a fundamental misunderstanding of the Federal Circuit's holding in *United States v. Amdahl Corp.*, 786 F.2d 387 (Fed.Cir.1986)," to which defendant had referred in its earlier submissions to the court for the proposition that quasi-contractual relief might be appropriate in the above-captioned case. Defendant maintains that even if the court had the power to grant Seven Resorts quasi-contractual relief, Seven Resorts would continue to be entitled to book value for its possessory interest because the parties agreed "to move the existing contract's termination date forward in time by a one-year increment, while keeping *all* other contract terms and conditions of the Concession Contract No. CC–LAME003–74 (*i.e.*, including contract terms and conditions regarding the measure of compensation) in place." (emphasis in original). Thus, according to defendant, even if quasi-contractual principles were applicable to the facts of the above-captioned case, and even if the parties' relationship was governed by an implied-in-fact contract, sections 12(a)(1) and 12(a)(2) of the original concessions contract should control the valuation of Seven Resorts' possessory interest, entitling Seven Resorts to book value under defendant's interpretation of the original concessions contract.

Defendant argues that the 1999, 2000 and 2001 Letter Authorizations represented valid extensions of the original concessions contract, which defendant maintains was extended by the 1998 Letter Authorization, pursuant to section 403(11) of the 1998 Concessions Act. After the expiration of the original concessions contract's term, defendant asserts

---

16. Defendant does not address the tension between its argument that the parties' relationship continued immediately after the expiration of the original concessions contract, notwithstanding NPS' failure to issue a public notice as required by the 1965 Concessions Act, and its position that an implied-in-fact contract could not have arisen had NPS lacked authority to continue the parties' relationship, when, as described below, may have been implicated by NPS' failure to issue a public notice.

that the parties' relationship was governed by:

(1) an implied-in-fact contract extension for the period between the expiration of the contract and the 'return,' in which Seven Resorts waived the expiration of its contract and continued to conduct the same operations at Lake Mead Lodge under the same contract terms and conditions, followed by (2) an express contract extension pursuant to 16 U.S.C. § 5952(11) [the codification of Section 403(11) of the 1998 Concessions Act] in which Seven Resorts unequivocally memorialized its agreement to modify the expiration date of Concession Contract No. CC–LAME003–74 to December 31, 1999 and then to December 31, 2000, acknowledging that "[a]ll other terms and conditions will remain the same."

(emphasis and alterations in original). Although the 2001 Letter Authorization became effective after the expiration of the 2000 Letter Authorization, defendant contends that the 2001 Letter Authorization was "an extension of the parties' existing contract," which was implied in fact as a result of Seven Resorts' continued operations after the expiration of the 2000 Letter Authorization on December 31, 2000 and "made express" when the 2001 Letter Authorization became effective.

According to defendant, each Letter Authorization that NPS issued after the 2001 Letter Authorization was issued pursuant to section 12(b) of the original concessions contract. Defendant maintains that section 12(b) "empowers the parties to continue their contract at any time on or after its termination for any reason, to include expiration, in order to prevent an interruption of service." With respect to the Letter Authorizations that became effective after the expiration of a previous Letter Authorization's term, defendant argues that the "continuation" of the original concessions contract under section 12(b) was conditioned only on a "request" by the Secretary, notwithstanding

that a number of the Letter Authorizations contained express language conditioning the effectiveness of each Letter Authorization on the Letter Authorization's receipt. According to defendant, Seven Resorts' continued performance at the request of the Secretary was *"mandatory"* under section 12(b). (emphasis in original). Defendant argues that the original concessions contract did not indicate that the Secretary's "request" must be made in a particular form, maintaining that the Secretary's request under section 12(b) could be oral or even *"de facto,* as demonstrated by specific circumstances." (emphasis in original). Defendant asserts that the timing of the Letter Authorizations in relation to when a previous Letter Authorization expired, accordingly, should have no impact on the court's analysis because "NPS had the unilateral authority to continue the contract in its discretion, and regardless of whether it first received a signed concurrence from Seven Resorts." Specifically, defendant states:

[T]o the extent that there may be a gap in any given year between the specified expiration date of a previous year's authorization and the finalization of a new authorization, Seven Resorts's continued and uninterrupted performance at Lake Mead Lodge demonstrates that (1) the parties' relationship was simply governed during that period by an implied-in-fact continuation of the contract pursuant to Section 12(b) of the parties' existing contract and all of that contract's terms and conditions, and that (2) the implied relationship was subsequently rendered an express one by the eventual completion of the authorization.

According to defendant, "[t]hat the NPS invoked 16 U.S.C. § 5952(11) [the codification of Section 403(11) of the 1998 Concessions Act] as a basis for extending the parties' contract from 1999 through 2001, and Section 12(b) thereafter should be of no consequence to this analysis." [17] Defendant argues that

17. Defendant relies on the parties' stipulation that "there is no functional difference between an 'extension' and a 'continuation' of an NPS concession contract with respect to how services are provided and administered under the [c]ontract" for the proposition that temporary "exten-

sions" issued under section 403(11) of the 1998 Concessions Act and "continuations" issued under section 12(b) should be treated as interchangeable in the court's analysis. Although defendant quotes the qualification to the parties' stipulation, that "extensions" and "continua-

those Letter Authorizations that became effective after the expiration of a previous Letter Authorization constituted temporary extensions of an existing concessions contract, rather than new contracts under the 1998 Concessions Act, because NPS' implementing regulations required NPS to issue a public notice in the Federal Register before awarding a temporary concessions contract under the 1998 Concessions Act, except in "emergency situations." *See* 36 C.F.R. § 51.24(a) (2000). Defendant interprets NPS' failure to issue a public notice of the issuance of each Letter Authorization and failure to comply with procedural steps prescribed by NPS' implementing regulations as proof that the Letter Authorizations did not constitute new concessions contracts.

Notwithstanding the court's specific request for additional information from the parties regarding the gap between the expiration of the original concessions contract's term and the issuance of the 1998 Letter Authorization, as well as similar gaps between the other Letter Authorizations, defendant advanced the same arguments that it initially submitted to the court in support of its argument that Seven Resorts was not awarded a new concessions contract under the 1998 Concessions Act. Defendant argues that the issuance of a Letter Authorization after the expiration of the original concessions contract's term, or the expiration of a previous Letter Authorization, could be interpreted as the "award[ ] of a new concessions contract ... replacing an existing concessions contract" only if the court were to adopt the interpretation of the 1998 Concessions Act set forth by the Civilian Board of Contract Appeals (CBCA) in *Libbey Physical Medicine Center and Hot Springs Health Spa v. Department of the Interior,* CBCA No. 1305, 09–1 BCA ¶ 34080, at 168, 488, 2009 WL 2762530, *joint motion to vacate denied,*09–2 BCA ¶ 34249, *joint motion for reconsideration denied,*09–2 BCA ¶ 34267. In *Libbey,* the parties argued that they had extended a concessions contract that was originally scheduled to expire on December 31, 1997 for eight successive one-year terms.

*Id.* at *3. Although the parties agreed that the concessioner was not "awarded a new concessions contract" under the 1998 Concessions Act, the CBCA determined that "an extension of an existing concessions contract issued after the Acts [sic] effective date is expressly treated as a new concessions contract." *Id.* at *8.

In support of its interpretation of the 1998 Concessions Act, the CBCA referred to section 403(2) of the 1998 Concessions Act, which states:

Except as otherwise provided in this section, prior to awarding a *new concessions contract (including renewals or extensions of existing concessions contracts)* the Secretary shall publicly solicit proposals for the concessions contract and, in connection with such solicitation, the Secretary shall prepare a prospectus and shall publish notice of its availability at least once in local or national newspapers or trade publications, and/or the Commerce Business Daily, as appropriate, and shall make the prospectus available upon request to all interested parties.

§ 403(2), 112 Stat. at 3504 (emphasis added) (codified at 16 U.S.C. § 5952(2)). The language highlighted above, however, does not define new concessions contracts to include extensions of existing concessions contracts, but rather indicates that, except as otherwise provided, the Secretary shall compete renewals or extensions of existing concessions contracts. Although Congress used the words "new concessions contract," "renewals," and "extensions of existing concessions contracts" when discussing competition requirements in section 403(2), Congress used only the phrase "new concessions contract" when discussing a concessioner's entitlement to a leasehold surrender interest under section 403(11) of the 1998 Concessions Act. *Compare* § 403(2), 112 Stat. at 3504, *with* § 403(11), 112 Stat. at 3507–08. The purpose of section 403(2) is not to define the phrase "new concessions contract," but to address requirements for the solicitation of proposals under the 1998

tions" may be differentiated based on "their legal characterization," defendant does not address

the stipulation's qualification.

Concessions Act. As defendant accurately notes:

> Far from being a definitions section providing that renewals and extensions of existing contracts are to be construed as "new contracts" for purposes of defining concessioner compensation, 16 U.S.C. § 5952(2) [the codification of Section 403(2) of the 1998 Concessions Act] merely lists renewals and extensions of existing contracts as vehicles that, like new concessions contracts, should be publicly solicited in the future.

(footnote omitted).

Defendant's interpretation of section 403(2), the section on which the CBCA relied in its decision in *Libbey*, is consistent with a distinction made between contracts and extensions in section 403(11) of the 1998 Concessions Act:

> [T]he Secretary may award, without public solicitation, the following:
>
> **(A)** A temporary concessions contract *or an extension* of an existing concessions contract for a term not to exceed 3 years . . .
>
> **(B)** A concessions contract in extraordinary circumstances. . . .

§ 403(11), 112 Stat. at 3507–08 (emphasis added). The CBCA cited section 403(11) as additional support for the proposition that an extension issued after the passage of the 1998 Concessions Act is "expressly treated as a new concessions contract." *Libbey Physical Medicine Ctr. & Hot Springs Health Spa v. Dep't of the Interior*, 2009 WL 2762530, at \*8. The CBCA's interpretation of section 403(11), however, is inconsistent with the principle that a statute should be interpreted to avoid rendering any of its provisions " 'surplusage,' " *see Duncan v. Walker*, 533 U.S. at 174, 121 S.Ct. 2120 (citation omitted), and "the 'normal rule of statutory construction' that 'identical words used in different parts of the same act are intended to have the same meaning.' " *Gustafson v. Alloyd Co.*, 513 U.S. at 570, 115 S.Ct. 1061 (citations omitted). The CBCA's interpretation would render meaningless the distinction between the first clause of section 403(11), which refers to a "concessions contract or an extension," and the second clause of section 403(11), which refers only to a "concessions contract." The court, therefore, does not adopt the CBCA's conclusion that an extension of an existing concessions contract is equivalent to the award of a new concessions contract under the 1998 Concessions Act.

Although the court does not share the CBCA's view that the reference to "extensions of an existing concessions contract" in section 403(2) of the 1998 Concessions Act necessarily indicates that an extension of a concessions contract after the passage of the 1998 Concessions Act constitutes the "award[ ] [of] a new concessions contract . . . replacing an existing concessions contract," contrary to defendant's apparent position, Seven Resorts possessory interest, theoretically, given certain facts, could have been transformed into a leasehold surrender interest under the 1998 Concessions Act depending on the specific facts presented as a result of the timing of NPS' issuance of the various Letter Authorizations at issue in the above-captioned case. Notwithstanding defendant's reminder to the court that the "parties absolutely *did not bargain to make leasehold surrender interest* the measure of Seven Resorts's compensation for its interest in Lake Mead Lodge," as noted above, the conversion of Seven Resorts' possessory interest into a leasehold surrender interest is not necessarily inconsistent with the original concessions contract's provision for a possessory interest. (emphasis in original). The 1998 Concessions Act provides that the value of Seven Resorts' possessory interest, however calculated, would serve as the "initial value" of Seven Resorts' leasehold surrender interest if Seven Resorts were "awarded a new concessions contract . . . replacing an existing concessions contract" after the effective date of the 1998 Concessions Act. The court, therefore, must determine whether any of NPS' successive authorizations of Seven Resorts' continued operations amounted to the "award[ ] [of] a new concessions contract . . . replacing an existing concessions contract" within the meaning of the phrase as it appears in the 1998 Concessions Act to determine if Seven Resorts' possessory interest was transformed into a leasehold surrender interest, preventing the court from determin-

ing the value of Seven Resorts' possessory interest under the original concessions contract.

NPS' interpretation of the 1998 Concessions Act is relevant to the court's analysis. Deference to the agency pursuant to *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, requires that a court ask the following questions when reviewing an agency's construction of a statute that it administers: First, the court must ask "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).[18] If the congressional intent is clear, then the court looks no further, "for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* (footnote omitted). However, if the statute is "ambiguous with respect to the specific issue," the court must ask the second question: "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778 (footnotes omitted); *see also Judulang v. Holder*, —— U.S. ——, 132 S.Ct. 476, 484 n.7, 181 L.Ed.2d 449 (2011) ("[U]nder *Chevron* step two, we ask whether an agency interpretation is ' "arbitrary or capricious in substance." ' " (quoting *Mayo Found. for Med. Ed. & Research v. United States*, —— U.S. ——, 131 S.Ct. 704, 711, 178 L.Ed.2d 588 (2011) (quoting *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 242, 124 S.Ct. 1741, 158 L.Ed.2d 450 (2004)))).

[I]f Congress has not specifically addressed the question, a reviewing court must respect the agency's construction of the statute so long as it is permissible. Such deference is justified because "[t]he responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones," and because of the agency's greater familiarity with the ever-changing facts and circumstances surrounding the subjects regulated.

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (quoting *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. at 866, 104 S.Ct. 2778) (other citations omitted).

With respect to an agency's statutory construction: "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question had arisen in a judicial proceeding." *Chevron*

---

**18.** It is unclear whether legislative history should be used in the first step of a *Chevron* analysis. *See Sash v. Zenk*, 428 F.3d 132, 137 n. 5 (2d Cir.2005) (citations omitted), *amended on denial of reh'g*, 439 F.3d 61 (2d Cir.), *cert. denied*,549 U.S. 920, 127 S.Ct. 277, 166 L.Ed.2d 212 (2006). *Compare Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 588, 594, 124 S.Ct. 1236, 157 L.Ed.2d 1094 (2004) (considering legislative history among other factors in concluding that statutory language was unambiguous); *Fathauer v. United States*, 566 F.3d 1352, 1358 (Fed.Cir. 2009) (Dyk, J. concurring) ("Since, in my view, the statutory language and legislative history are not determinative, we would normally invoke *Chevron* deference."), *with Nat'l R.R. Passenger Corp. v. Bos. & Me. Corp.*, 503 U.S. 407, 417, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992) ("If the agency interpretation is not in conflict with the plain language of the statute, deference is due.... In ascertaining whether the agency's interpretation is a permissible construction of the language, a court must look to the structure and language of the statute as a whole."); *K Mart Corp. v. Cartier, Inc.* 486 U.S. 281, 293 n. 4, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988) (opinion of Kennedy, J.) ("First, the threshold question in ascertaining the correct interpretation of a statute is whether the language of the statute is clear or arguably ambiguous. The purported gloss any party gives to the statute, or any reference to legislative history, is in the first instance irrelevant."). Because neither the text of the 1998 Concessions Act nor NPS' implementing regulations offers guidance on when a new concessions contract can be said to be "replacing" an existing concessions contract, the court refers to the legislative history of the 1998 Concessions Act. *See Bennett v. Merit Sys. Prot. Bd.*, 635 F.3d 1215, 1218 (Fed.Cir. 2011) ("If a statute requires interpretation beyond the terms of the language, we can use its legislative history to inform the statutory interpretation—analysis of legislative history is also a 'traditional tool of statutory construction.' ") (quoting *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 106, 127 S.Ct. 1534, 167 L.Ed.2d 449 (Stevens, J. concurring), *reh'g denied*,551 U.S. 1110, 127 S.Ct. 2931, 168 L.Ed.2d 257 (2007)). The meaning of the term "replacing," however, is ambiguous. The court, therefore, refers to legislative history as a traditional tool of statutory construction. *See Bartels Trust for the Benefit of Cornell Univ. ex rel. Bartels v. United States*, 617 F.3d at 1361.

U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 843 n. 11, 104 S.Ct. 2778 (citations omitted). However, "[d]eference does not mean acquiescence." Presley v. Etowah Cnty. Comm'n, 502 U.S. 491, 508, 112 S.Ct. 820, 117 L.Ed.2d 51 (1992). "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 843 n. 9, 104 S.Ct. 2778 (citations omitted). Thus, this court should defer to an agency's construction of the statute if it "reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' express intent." Rust v. Sullivan, 500 U.S. 173, 184, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (citing Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 842–43, 104 S.Ct. 2778). The converse is likewise true; the court should only defer to the agency's interpretation if it is not in conflict with the congressional intent.

■ The Secretary of the Department of Interior is tasked with implementing the 1998 Concessions Act. See 112 Stat. at 3516 ("As soon as practicable after the effective date of this title, the Secretary shall promulgate regulations appropriate for its implementation."). The NPS implementing regulations define a number of terms that appear in the 1998 Concessions Act. See 36 C.F.R. § 51.3 (2013). Although the regulatory definitions apply directly to terms as they appear in the regulations, rather than as they appear in the 1998 Concessions Act, the regulations embody the NPS' interpretation of the 1998 Concessions Act. See Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 806, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003); Concession Contracts, 65 Fed.Reg. 20,630–01, 20,631 (Apr. 17, 2000) ("The final rule reflects NPS's interpretation of the various

provisions of the 1998 Act to appropriately administer the Act's requirements and purposes that are suitable for regulatory implementation."). The court, therefore, should defer to the NPS' definition of terms in the implementing regulations to the 1998 Concessions Act, which represent NPS' interpretation of the 1998 Concessions Act, to the extent that the 1998 Concessions Act is ambiguous, and, to the extent that the regulations advance a permissible interpretation of terms as they appear in the statute. See FDA v. Brown & Williamson Tobacco Corp., 529 U.S. at 132, 120 S.Ct. 1291.[19]

NPS' implementing regulations define a "concession contract" as "a binding written agreement between the Director and a concessioner entered under the authority of this part of the 1965 Act that authorizes the concessioner to provide certain visitor services within a park area under the specified terms and conditions." See 36 C.F.R. § 51.3. According to NPS' implementing regulations, therefore, an agreement must be in writing in order to constitute a "concession contract" under the 1998 Concessions Act. See Concession Contracts, 65 Fed.Reg. 20,630–01, 20,634 (Apr. 17, 2000) ("The general concessioner organization requested clarification of this definition with respect to when a concession contract can be something other than a written agreement. NPS has deleted the phrase 'unless otherwise indicated in this part' in response to this comment."). NPS' implementing regulations define "[t]he award of a concession contract" as "the establishment of a legally binding concession contract," which "occurs only when the Director and a selected offeror both fully execute a concession contract." 36 C.F.R. § 51.3. The regulations define an "[o]fferor" as "an individual, corporation, or other legally recognized entity, including an existing concessioner, that submits a proposal for a concession contract." Id. Regulatory definitions of key terms, therefore, indicate that, under NPS' interpretation of the 1998 Concessions Act, a concessioner is "awarded a new concessions contract" when NPS and the concessioner enter into a written concessions contract af-

---

19. That NPS did not issue implementing regulations until April 17, 2000 does not change the court's analysis of whether the regulations advance a permissible interpretation of the 1998 Concessions Act.

ter the concessioner responds to a solicitation.

■ Neither the 1998 Concessions Act nor the legislative history of the 1998 Concessions Act clearly establishes the meaning of the term "concessions contract." The court, therefore, defers to the interpretation of the term advanced by NPS' implementing regulations, which define a "concessions contract" as "a binding *written agreement* between the Director and a concessioner entered under the authority of this part[, which implements the 1998 Concessions Act,] or the 1965 Act that authorizes the concessioner to provide certain visitor services within a park area under specified terms and conditions." 36 C.F.R. § 51.3 (emphasis added). NPS' definition of the term "concessions contract" includes written contracts entered into under either the 1998 Concessions Act or the 1965 Concessions Act, but does not include implied-in-fact contracts that may arise as a result of the relationship between NPS and a concessioner.

Although NPS' implementing regulations also define "[t]he award of a concession contract," the court does not defer to NPS' definition of the phrase because the text of the 1998 Concessions Act unambiguously describes the circumstances in which a concessions contract may be "awarded" to a concessioner. The 1998 Concessions Act provides that a concessioner may be a "awarded" a concessions contract: (1) pursuant to a solicitation, or (2) pursuant to the Secretary's authority to award a concessions contract without public solicitation under section 403(11) of the 1998 Concessions Act. *See* § 403, 112 Stat. at 3504–08.

In addition, even if the meaning of the term "awarded" were ambiguous, NPS regulations do not present a permissible construction of the term as it appears in the phrase, "awarded a new concessions contract ... replacing an existing concessions contract." Under NPS' definition, an award "occurs only when the Director and a selected offeror both fully execute a concession contract," which indicates that a concessions contract may only be "awarded" pursuant to a solicitation. 36 C.F.R. § 51.3. That a concessions contract may only be "awarded"

pursuant to a solicitation, however, directly contradicts the text of the 1998 Concessions Act. Section 403(1) of the 1998 Concessions Act provides that, "[e]xcept as otherwise provided in this section, all proposed concessions contracts shall be awarded by the Secretary ... through a competitive selection process." § 403(1), 112 Stat. at 3504. Section 403(11), the provision on which NPS relied in issuing the 1999, 2000, and 2001 Letter Authorizations, however, provides:

> EXCEPTIONS.—Notwithstanding the provisions of this section, the Secretary may *award,* without public solicitation, the following:
>
> (A) A temporary concessions contract or an extension of an existing concessions contract for a term not to exceed 3 years in order to avoid interruption of services to the public at a unit of the National Park System, except that prior to making such an award, the Secretary shall take all reasonable and appropriate steps to consider alternatives to avoid such interruption.

§ 403(11)(A), 112 Stat. at 3507–08 (emphasis added); *see also* 36 C.F.R. § 51.24 (2000) ("[T]he Director may award non-competitively a temporary concession contract or contracts...."). Section 403(11)(B) also provides that a concessions contract may be awarded without public solicitation "in extraordinary circumstances where compelling and equitable considerations require the award of a concessions contract to a particular party in the public interest." *See* § 403, 112 Stat. at 3508; *see also* 36 C.F.R. § 51.25 (2000). The 1998 Concessions Act, therefore, expressly provides that a concessions contract can be awarded in limited circumstances without the public solicitation of proposals. NPS even recognized this fact in its initial publication of its implementing regulations to the 1998 Concessions Act when it stated: *"With certain exceptions,* the 1998 Act requires competitive award of concession contracts." *See* Concession Contracts, 65 Fed.Reg. 20,630–01, 20,631 (April 17, 2000) (emphasis added). The regulatory definition of "[t]he award of a concession contract," therefore, cannot be applied to interpret the meaning of the phrase "awarded a new con-

cessions contract ... replacing an existing concessions contract" because the regulatory definition ignores circumstances in which the 1998 Concessions Act expressly provides that a contract may be awarded without issuing a public solicitation and ignores NPS own interpretation of its implementing regulation in its initial publication. *See Gustafson v. Alloyd Co.*, 513 U.S. at 570, 115 S.Ct. 1061 (" '[I]dentical words used in different parts of the same act are intended to have the same meaning.' " (quoting *Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. at 342, 114 S.Ct. 843)).

The structure of the 1998 Concessions Act also provides the court with an understanding of what constitutes an "existing concessions contract." Section 405(b) of the 1998 Concessions Act, which addresses the compensation concessioners are to receive for possessory interests created by contracts entered into under the 1965 Concessions Act, states:

(1) A concessioner which has obtained a possessory interest as defined pursuant to Public Law 89–249 [the 1965 Concessions Act] ..., as in effect on the day before the date of the enactment of this Act [the 1998 Concessions Act], *under the terms of a concession contract entered into before that date* [the date of the 1998 Concessions Act's enactment] shall, upon the expiration or termination of such contract, be entitled to receive compensation for such possessory interest improvements in the amount and manner as *described by such concessions contract.* Where such a possessory interest is *not described in the existing contract,* compensation of possessory interest shall be determined in accordance with the laws in effect on the day before the date of enactment of this Act.

(2) In the event such prior concessioner is awarded a new concessions contract after the effective date of this title *replacing an existing concessions contract,* the existing concessioner shall, instead of directly receiving such possessory interest compensation, have a leasehold surrender interest in its existing possessory interest improvements under the terms of the new contract. . . .

§ 405(b), 112 Stat. at 3509 (emphasis added). When the phrase "replacing an existing concessions contract" is put in context, as described below, it is apparent that an "existing concessions contract" is a concessions contract that entitled a concessioner to a possessory interest and was entered into under the 1965 Concessions Act. The reference to "the existing contract," in the first paragraph quoted above, refers to a concessions contract that creates a possessory interest, which was "entered into" before the passage of the 1998 Concessions Act. The reference to "an existing concessions contract," in the second paragraph quoted above, therefore, is related to phrase "possessory interest compensation," which is defined in the first paragraph as corresponding to the possessory interest created by an "existing contract" that was entered into before the passage of the 1998 Concessions Act. *See id.* The reference to "the existing contract" in the first paragraph quoted above and the reference to "an existing concessions contract" in the second paragraph above, therefore, refer to the same contracts. *See Gustafson v. Alloyd Co.*, 513 U.S. at 570, 115 S.Ct. 1061 (" '[I]dentical words used in different parts of the same act are intended to have the same meaning.' " (quoting *Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. at 342, 114 S.Ct. 843)). Thus, in order for a "new concessions contract" to "replac[e] an existing concessions contract," and convert a possessory interest into a leasehold surrender interest, the "existing concessions contract" must have been entered into under the 1965 Concessions Act. *See* § 405(b), 112 Stat. at 3509.

It is unclear from the statutory text, however, under what circumstances a new concessions contract can be said to be "replacing" "an existing concessions contract." A report issued by the Senate Committee on Energy and Natural Resources (the Senate Committee Report) indicates that Congress may have intended for a new concessions contract to be said to be "replacing" an existing concessions contract in relatively broad circumstances. *See* S.Rep. No. 105–202 (1998). The Senate Committee Report states with respect to section 405(b) of the 1998

Concessions Act, which relates to the disposition of existing possessory interests:

> [S]ubsection (b) provides that a concessioner which has obtained a possessory interest as defined in the 1965 Act (Public Law 89–249) under the terms of a concession contract entered into prior to the date of enactment of this title, shall, upon the expiration or termination of the contract: (1) be entitled to receive compensation for such possessory interest improvements in the amount and manner as described by the prior concession contract; and (2), in the event such prior concessioner is awarded a new concession contract *concerning the same facilities and services* after the effective date of this title, the existing concessioner, instead of directly receiving possessory interest compensation, is to have a leasehold surrender interest in its existing possessory interest improvements under the terms of the new contract. . . .

■ S. Rep. No. 105–202, at 34–35 (emphasis added). The Senate Committee Report does not provide a time limitation on when a new concessions contract can be said to be "replacing" an existing concessions contract, thereby transforming a concessioner's possessory interest into a leasehold surrender interest. *See id.* The Senate Committee Report indicates only that a new concessions contract "replac[es]" an existing concessions contract when the new concessions contract "concern[s] the same facilities and services" as the existing concessions contract and the new concessions contract is awarded after the effective date of the 1998 Concessions

Act.[20] *See id.* Although an existing concessioner may receive a windfall under the 1998 Concessions Act if the concessioner receives a leasehold surrender interest upon being awarded a new concessions contract under the 1998 Concessions Act, and is allowed to "carry over as the initial value of such leasehold surrender interest . . . an amount equal to the value of the existing possessory interest as of the termination date of the previous contract," rather than the value of the existing possessory interest as of the date of the award of a new contract, the court adopts the meaning that the Senate Committee Report appears to assign to the term "replacing" because the Senate Committee Report's apparent interpretation of the term is consistent with the lack of a time limitation in the plain meaning of the word "replace."[21] *See Webster's Third New International Dictionary* 1925 (1971) (defining "replace" as "to restore to a former place, position, or condition," "to take the place of: serve as a substitute for or successor of," or "to fill the place of: supply an equivalent for."). Considering the Senate Committee Report, the text and structure of the 1998 Concessions Act, and NPS' interpretation of the meaning of the term "concessions contract," the court concludes, therefore, that a concessioner is "awarded a new concessions contract . . . replacing an existing concessions contract" under the 1998 Concessions Act when the concessioner is awarded a written concessions contract, pursuant to either a solicitation or the Secretary's authority to award a contract under section 403(11) of the 1998 Concessions

**20.** NPS implementing regulations in contrast, appear to place a time limitation on a concessioner's entitlement to compensation for the value of its possessory interest:

> A concessioner that has possessory interest in real property improvements pursuant to the terms of a 1965 Act concession contract, will, if the prior concessioner does not seek or is not awarded a new concession contract *upon expiration or other termination of its 1965 Act Concession contract,* be entitled to receive compensation for its possessory interest in the amount and manner described by the possessory interest concession contract.

36 C.F.R. § 51.68 (2000) (emphasis added). That a concessioner may be entitled to receive a possessory interest if the concessioner is not awarded a new concessions contract "upon the expiration or other termination" of an existing concessions contract, however, does not necessarily indicate that the concessioner's possessory interest may not later be converted into a leasehold surrender interest upon the award of a new concessions contract "concerning the same facilities and services" as the existing concessions contract. *See* S.Rep. No. 105–202, at 34.

**21.** If the court were to conclude that the phrase "awarded a new concessions contract . . . replacing an existing concessions contract" contained an implied time limitation, then the 1999 Letter Authorization did not "replace" the original concessions contract, and, therefore, would serve as an additional basis for the court's conclusion below that Seven Resorts possessory interest was not converted into a leasehold surrender interest under the 1998 Concessions Act.

Act, "concerning the same facilities and services" as a concessions contract entered into under the 1965 Concessions Act.

■ Although the original concessions contract in the above-captioned case expired on December 31, 1997, the 1998 Letter Authorization was not issued until March 18, 1998 and was not accepted by Seven Resorts until March 23, 1998. The parties' relationship between December 31, 1997 and March 23, 1998, therefore, was not governed either by the original concessions contract or by the 1998 Letter Authorization. An implied-in-fact contract is an agreement " ' "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." ' " *Trauma Serv. Grp. v. United States,* 104 F.3d 1321, 1326 (Fed.Cir.1997) (quoting *Hercules, Inc. v. United States,* 516 U.S. at 424, 116 S.Ct. 981 (quoting *Balt. & Ohio R.R. Co. v. United States,* 261 U.S. 592, 597, 43 S.Ct. 425, 67 L.Ed. 816 (1923))); *see also Bank of Guam v. United States,* 578 F.3d 1318, 1329 (Fed.Cir.2009) (citing *Trauma Serv. Grp. v. United States,* 104 F.3d at 1326); *Bay View, Inc. v. United States,* 278 F.3d 1259, 1265–66 (Fed.Cir.2001) (citation omitted), *reh'g and reh'g en banc denied,* 285 F.3d 1035 (Fed. Cir.), *cert. denied,* 537 U.S. 826, 123 S.Ct. 114, 154 L.Ed.2d 37 (2002); *Westlands Water Dist. v. United States,* 109 Fed.Cl. 177, 203 (2013); *Peninsula Grp. Capital Corp. v. United States,* 93 Fed.Cl. 720, 728 (2010) (citing *Balt. & Ohio R.R. Co. v. United States,* 261 U.S. at 597, 43 S.Ct. 425; *Russell Corp. v. United States,* 210 Ct.Cl. 596, 609, 537 F.2d 474, 482 (1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977)). Such an agreement will not be implied "unless the meeting of minds was indicated by some intelligible conduct, act or sign." *Balt. & Ohio R.R. Co. v. United States,* 261 U.S. at 598, 43 S.Ct. 425; *see also Russell Corp. v. United States,* 210 Ct.Cl. at 609, 537 F.2d at 482.

■ The elements of a binding contract with the United States are identical for express and implied-in-fact contracts. *See De Archibold v. United States,* 57 Fed.Cl. 29, 32 (2003) (citing *Trauma Serv. Grp. v. United States,* 104 F.3d at 1325); *see also Flexfab, L.L.C. v. United States,* 424 F.3d 1254, 1265 (Fed.Cir.2005) (citing *Schism v. United States,* 316 F.3d 1259, 1278 (Fed.Cir.2002) (en banc), *cert. denied,* 539 U.S. 910, 123 S.Ct. 2246, 156 L.Ed.2d 125 (2003)); *Mastrolia v. United States,* 91 Fed.Cl. 369, 384 (2010) (citing *Flexfab, L.L.C. v. United States,* 424 F.3d at 1265); *Anderson v. United States,* 344 F.3d 1343, 1353 (Fed.Cir.2003) (citing *Cal. Fed. Bank, FSB v. United States,* 245 F.3d 1342, 1346 (Fed.Cir.2001); *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990); *Russell Corp. v. United States,* 210 Ct.Cl. 596, 537 F.2d at 481–82); *Rivera v. United States,* 105 Fed.Cl. 644, 650 (2012). The government, however, " 'is not bound by its agents acting beyond their authority and contrary to regulation.' " *Urban Data Sys., Inc. v. United States,* 699 F.2d 1147, 1153 (Fed.Cir.1983) (quoting *Yosemite Park and Curry Co. v. United States,* 217 Ct.Cl. 360, 370, 582 F.2d 552, 558 (1978) (citing *Fed. Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947))) (other citations omitted); *see also Chattler v. United States,* 632 F.3d 1324, 1330 (Fed.Cir.), *reh'g en banc denied* (Fed.Cir.2011); *Toon v. United States,* 96 Fed.Cl. 288, 299–300 (2010); *Gonzalez–McCaulley Inv. Grp., Inc. v. United States,* 93 Fed.Cl. 710, 714 (2010). "The requirements for a valid contract with the United States are: a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract." *Total Med. Mgmt., Inc. v. United States,* 104 F.3d 1314, 1319 (Fed. Cir.) (citations omitted), *reh'g denied and en banc suggestion declined* (Fed.Cir.), *cert. denied,* 522 U.S. 857, 118 S.Ct. 156, 139 L.Ed.2d 101 (1997).

■ If an official lacks authority to bind the government in its contractual relations, however, the " 'knowing acceptance of benefits by those empowered to bind the government can result in ratification of the unauthorized official's promise.' " *See Perri v. United States,* 53 Fed.Cl. 381, 401 (2002) (emphasis removed) (quoting *Janowsky v.*

*United States*, 23 Cl.Ct. 706, 715 n. 10 (1991), *rev'd on other grounds*, 989 F.2d 1203 (Fed. Cir.1993) (unpublished table decision)), *aff'd*, 340 F.3d 1337 (Fed.Cir.2003). In *Harbert/Lummus Agrifuels Projects v. United States*, the Federal Circuit explained:

> Agreements made by government agents without authority to bind the government may be subsequently ratified by those with authority if the ratifying officials have actual or constructive knowledge of the unauthorized acts. . . . [R]atification must also be based on a demonstrated acceptance of the contract. . . . Silence in and of itself is not sufficient to establish a demonstrated acceptance of the contract. . . .

*Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1433–34 (Fed.Cir.), *reh'g denied, and suggestion for reh'g in banc declined* (Fed.Cir.1998), *cert. denied*, 525 U.S. 1177, 119 S.Ct. 1111, 143 L.Ed.2d 107 (1999).

▇ If, after the expiration of a contract, the parties to the contract continue to perform under the contract's terms, the parties' relationship is generally governed by a new, implied-in-fact contract that incorporates the terms of the expired contract. *See Martin v. Campanaro*, 156 F.2d 127, 129 (2d Cir.) (applying New York law), *cert. denied,*329 U.S. 759, 67 S.Ct. 112, 91 L.Ed. 654 (1946); *see also Nat'l Union Fire Ins. Co. v. Showa Shipping Co.*, 166 F.3d 343, Nos. 97–16374, 97–16375, 1991 WL 23134, *3 n.6 (9th Cir. 1999) (unpublished table decision) (citations omitted) (agreeing with this "widely accepted principle"); *Local Union 813 v. Waste Mgmt. of N.Y., LLC*, 469 F.Supp.2d 80, 84–85 (E.D.N.Y.2007) ("[U]nder general principles of contract law, the terms of an agreement may be applied to the parties' post-expiration relationship."); *Roth v. Naturally Vitamin Supplements, Inc.*, No. CV–04–2135–PHX–FJM, 2006 WL 988118, *2 (D.Ariz. Apr. 14, 2006) (applying Arizona law); *Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc.*, 295 F.Supp.2d 1063, 1074 (D.Minn.2003), *aff'd*, 408 F.3d 460 (8th Cir.2005); *Cloverdale Equip. Co. v. Manitowoc Eng'g Co.*, 964 F.Supp. 1152, 1161–62 (E.D.Mich.1997) (citations omitted) (applying Michigan law), *aff'd*, 149 F.3d 1182 (6th Cir.1998) (unpublished

table decision); *Jurrens v. Lorenz Mfg. Co. of Benson*, 578 N.W.2d 151, 153 (S.D.1998). Although the terms of the new implied-in-fact contract may be identical to the terms of the expired contract, the expired contract no longer governs the parties' relationship. *See* 17 Am.Jur.2d *Contracts* § 589 ("[W]here, after the expiration of a contract fixing the reciprocal rights and obligations of the parties, they continue to do business together, the conduct of the parties may at times permit, or even require, a finding that they impliedly agree that their rights and obligations in connection with such business should continue to be measured as provided in the old contract; but even in such case, the reciprocal obligations arise from the new implied contract, and unless an intent to make such a new contract is expressed or may be fairly inferred from the conduct of the parties, the obligations of the parties are not measured by the terms of the expired contract." (citing *N.Y. Tel. Co. v. Jamestown Tel. Corp.*, 282 N.Y. 365, 26 N.E.2d 295 (1940))).

▇ The parties agree that NPS and Seven Resorts shared a mutual intent to contract for the period between the expiration of the original concessions contract's term and the effective date of the 1998 Letter Authorization. That Seven Resorts continued operations at Lake Mead Lodge, and that the parties agreed to continue operations after the 1998 Letter Authorization without new contract language, indicates that the parties mutually agreed to continue their relationship after the expiration of the original concessions contract without altering the original concessions contract's terms. *See id.* § 466 ("When a contract lapses but the parties to the contract continue to act as if they are performing under the contract, the material terms of the prior contract will survive intact unless either one of the parties clearly and manifestly indicates, through words or through conduct, that he or she no longer wishes to continue to be bound thereby, or both parties mutually intend that the terms not survive."). The parties' relationship after the expiration of the original concessions contract on December 31, 1997, and before the effective date of the 1998 Letter Authori-

zation, therefore, was governed by an implied-in-fact contract, which incorporated the terms of the original concessions contract, to the extent that NPS had authority to enter into a contract with Seven Resorts.

The record before the court does not clearly indicate whether a NPS representative with sufficient authority authorized Seven Resorts to continue operations in the period between the expiration of the original concessions contract's term and the issuance of the 1998 Letter Authorization. It appears, however, that the Regional Director of NPS who issued the 1998 Letter Authorization may have ratified [22] Seven Resorts' continuation of operations after the expiration of the original concessions contract, stating that the 1998 Letter Authorization was issued to "assure the *continuation* of the services being offered at Lake Mead National Recreation Area under Concession Contract No. CC–LAME003–74," which, according to the 1998 Letter Authorization, Seven Resorts was "presently" authorized to conduct. (emphasis added).

Although the 1998 Letter Authorization appears to have been a "demonstrated acceptance" of Seven Resorts' continued opera-

tions, *see Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d at 1434, NPS may have violated the 1965 Concessions Act in allowing Seven Resorts to continue to conduct operations immediately after the expiration of the original concessions contract's term. The 1965 Concessions Act required NPS to give "reasonable public notice" of any "extensions, renewals, or new contracts" issued under the 1965 Concessions Act. *See* §§ 4, 5, 79 Stat. at 970; *see also* 36 C.F.R. §§ 51.4, 51.5 (1998). Unlike the implementing regulations to the 1998 Concessions Act, the implementing regulations to the 1965 Concessions Act did not clearly preclude an implied-in-fact contract from constituting a "concession contract." *See* 36 C.F.R. § 51.3 (1998). NPS, therefore, may have been required to issue a public notice before entering into any extension, renewal, or new contract, whether express or implied, immediately after the expiration of the original term of the concessions contract with plaintiff, which NPS appears not to have done, as defendant conceded it could not locate a public notice of NPS' issuance of the 1998 Letter Authorization.

**22.** NPS was established "under the charge" of its Director. *See* Act of August 25, 1916, 64 Pub.L. No. 235, 39 Stat. 535, 535. The Secretary's authority under the 1998 Concessions Act has been delegated to the Director of NPS. *See Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. at 806, 123 S.Ct. 2026. Implementing regulations to the 1998 Concessions Act indicate that the Director, or an authorized representative of the Director, has the authority to award a temporary concessions contract under section 403(11)(A) of the 1998 Concessions Act. *See* 36 C.F.R. § 51.24 (2000); *see also* 36 C.F.R. § 51.3 (2000) ("Director means the Director of the National Park Service (acting on behalf of the Secretary), or an authorized representative of the Director...."). NPS' implementing regulations limit the Director's ability to delegate his or her authority to award concessions contracts that anticipate annual gross receipts above a specified dollar threshold, *see* 65 Fed.Reg. 20,630–01, 20,-672–73 (Apr. 17, 2000); *see also* 36 C.F.R. § 51.22 (2000), and previous delegations of the Director's authority to regional directors explicitly exclude the authority to "execute" concessions contracts that exceed a specified term or that anticipate annual gross receipts above a specified dollar threshold. *See, e.g.,* 38 Fed.Reg. 7,477, 7,478 (Mar. 22, 1973). The record before the court does not indicate whether the authorization of Seven Resorts' continued operations falls

within one of the specified exceptions to the delegation of the Director's authority. If the Regional Director lacked authority to ratify Seven Resorts' continued operations immediately after the expiration of the original concessions contract's term, the parties' relationship would not have been governed by an implied-in-fact contract. *See Cal. Sand & Gravel, Inc. v. United States*, 22 Cl.Ct. 19, 27 (1990) ("For effective ratification, a superior must have authority to ratify ...." (citation omitted)), *aff'd*, 937 F.2d 624 (Fed.Cir.1991), *cert. denied*, 502 U.S. 1057, 112 S.Ct. 934, 117 L.Ed.2d 105 (1992); *cf. Winter v. Cath-dr/Balti Joint Venture*, 497 F.3d 1339, 1344 (Fed.Cir.2007) ("Where a party contracts with the government, apparent authority of the government's agent to modify the contract is not sufficient; an agent must have actual authority to bind the government." (citing *Trauma Serv. Grp. v. United States*, 104 F.3d at 1325)). That no contractual relationship may have existed between the parties immediately after the expiration of the original concessions contract's term, however, does not change the court's analysis because, as indicated below, Seven Resorts was not "awarded a new concessions contract ... replacing an existing concessions contract" regardless of whether an implied-in-fact contract was created as a result of the parties' conduct following the expiration of the original concessions contract's term.

A number of authorities have suggested that an implied-in-fact contract may arise when an individual with contracting authority accepts goods or services on behalf of the government pursuant to an express contract that is later declared void for violation of a procurement statute or regulation. In *Prestex Inc. v. United States*, the United States Court of Claims recognized the general principle that a government agent does not have authority to bind the government in its contractual relations if the agent entered into a contractual relationship in violation of a procurement statute or regulation:

> It is a well recognized principle of procurement law that the contracting officer, as agent of the executive department, has only that authority actually conferred upon him [or her] by statute or regulation. If, by ignoring statutory and regulatory requirements, he [or she] exceeds his [or her] actual authority, the Government is not estopped to deny the limitations on his [or her] authority, even though the private contractor may have relied on the contracting officer's apparent authority to his [or her] detriment, for the contractor is charged with notice of all statutory and regulatory limitations.

*Prestex Inc. v. United States*, 162 Ct.Cl. 620, 625, 320 F.2d 367, 371 (1963) (footnotes omitted). The Court of Claims also explained, however, that "[e]ven though a contract be unenforceable against the Government, because not properly advertised, not authorized, or for some other reason, it is only fair and just that the Government pay for goods delivered or services rendered and accepted under it." *Prestex Inc. v. United States*, 162 Ct.Cl. at 628, 320 F.2d at 373. The court reasoned that "[n]o one would deny that ordinary principles of equity and justice preclude the United States from retaining the services, materials, and benefits and at the same time refusing to pay for them on the ground that the contracting officer's promise was unauthorized, or unenforceable for some other reason." *Id.*

In *Urban Data Systems, Inc. v. United States*, the United States Court of Appeals for the Federal Circuit further explained that an implied-in-fact contract may arise when the government enters into a contract that incorporates a term in violation of a procurement statute or regulation. See *Urban Data Sys., Inc. v. United States*, 699 F.2d 1147. After concluding that that a contractor had entered into two "cost-plus-a-percentage-of-cost" contracts with the government in violation of procurement regulations, the Federal Circuit held that the government could seek to invalidate the parties' contract based on a lack of authority to enter into a "cost-plus-a-percentage-of-cost" contract. See *id.* at 1153. The Federal Circuit concluded that, "even if the government's agent instigated the inclusion of the cost-plus-a-percentage-of-cost provisions in the two subcontracts, we cannot estop the Government from denying their validity." *Id.* at 1154. Similar to *Prestex*, however, the Federal Circuit also held that the contractor was entitled to recovery "on a *quantum valebant* basis" because "the Government bargained for, agreed to pay for, and accepted the supplies delivered by Urban." *Id.*

Subsequently, in *United States v. Amdahl Corp.*, the Federal Circuit clarified the logic of *Prestex* and *Urban Data Systems*, explaining that a contractor's recovery in circumstances when the government accepts goods and services under an otherwise invalid contract arises under an implied-in-fact contract, rather than the invalid contract:

> [I]n many circumstances it would violate good conscience to impose upon the contractor *all* economic loss from having entered an illegal contract. Where a benefit has been conferred by the contractor on the government in the form of goods or services, which it accepted, a contractor may recover at least on a *quantum valebant* or *quantum meruit* basis for the value of the conforming goods or services received by the government prior to the rescission of the contract for invalidity. The contractor is not compensated *under* the contract, but rather under an implied-in-fact contract.

*United States v. Amdahl Corp.*, 786 F.2d at 393 (all emphasis in original) (footnote omitted); *see also Gould, Inc. v. United States*, 67 F.3d 925, 930 (Fed.Cir.1995) ("*United States v. Amdahl Corp*.... explains that a

contractor can be compensated under an implied-in-fact contract when the contractor confers a benefit to the government in the course of performing a government contract that is subsequently declared invalid."). The Federal Circuit also clarified that the amount that a contractor can recover from an implied-in-fact contract in these circumstances "is limited to the value of the benefits to the government," indicating that "if the government receives no benefit from the contractor's performance, the contractor receives no compensation." *See United States v. Amdahl Corp.*, 786 F.2d at 393 (emphasis removed).

The reasoning set forth in *Prestex, Urban Data Systems*, and *Amdahl* has been challenged as authorizing recovery arising from a contract implied in law, rather than a contract implied in fact, because government agents lack authority to enter into an implied-in-fact contract in violation of a procurement statute or regulation. *See, e.g., Mega Constr. Co. v. United States*, 29 Fed. Cl. 396, 471–72 (1993) ("It is clear that the theory of contract which *Amdahl* expounded more properly fits under the definition of a contract implied-in-law as opposed to a contract implied-in-fact. This is because a contract implied-in-fact may exist only when all the elements of an express contract are present, . . . whereas under *Amdahl*, all the elements of a contract need not be present. . . . *Amdahl* referred to the contract as implied-in-fact, although the decision speaks of contracts being unenforceable if they are 'not authorized.'" (citations omitted)); *Chavez v. United States*, 18 Cl.Ct. 540, 547 (1989) ("[T]he recovery to which *Amdahl* refers would have to be under a contract implied-in-law . . . .").[23] At least one law review critique

of *Prestex, Urban Data Systems*, and *Amdahl* also suggests that ratification cannot cure deficiencies in a contract that is entered into in violation of a procurement statute or regulation:

Although the Federal Circuit described the recovery in *Amdahl* as being based on a theory of implied-in-fact contract, recovery under that theory appears impossible because the government was not authorized to enter into such an agreement. Unlike the situations in which a government official's unauthorized conduct can be ratified by a government official or agency, in *Amdahl*, the entire government lacked such authority. Thus, the formation of either a traditional express or implied-in-fact contract was impossible.

Willard L. Boyd, *Implied–In–Fact Contract: Contractual Recovery Against the Government Without an Express Agreement*, 21 Pub. Cont. L.J. 84, 124 (1991); *see also* William L. Boyd & Robert K. Huffman, *The Treatment of Implied–In–Law and Implied–In–Fact Contracts and Promissory Estoppel In the United States Claims Court*, 40 Cath. U.L.Rev. 605, 617–618 (1991) (arguing with respect to *Amdahl* that "[n]o implied-in-fact contract can exist because there is no authority on the part of *any* government official to enter into an agreement" and, therefore, "[t]he requirement that there by an invalid contractual relationship that benefitted the government, therefore, should be viewed only as a limitation on the types of implied-in-law contracts to which the Federal Government will be held liable").

 Notwithstanding the criticism of *Prestex, Urban Data Systems*, and *Amdahl*, the Federal Circuit has recognized that an

---

**23.** The Judge in *Mega Construction* and *Chavez* also noted that, "[b]ecause the Court of Appeals for the Federal Circuit is an Article Three court of the United States Constitution, its exercise of equitable power in *Amdahl* was within its jurisdictional mandate." *See Mega Constr. Co. v. United States*, 29 Fed.Cl. at 472; *Chavez v. United States* 18 Cl.Ct. at 547. The Judge in *Mega Construction* and *Chavez* also argued that the result in *Amdahl* would not be appropriate in the Claims Court or the Court of Federal Claims, both of which were established under Article One of the United States Constitution and both of which were "statutorily devoid of equitable juris-

diction in this area of the law." *Chavez v. United States* 18 Cl.Ct. at 547; *see also Mega Constr. Co. v. United States*, 29 Fed.Cl. at 472; *Northrop Grumman Corp. v. United States*, 47 Fed.Cl. 20, 41 (2000) ("[A]lthough the Federal Circuit intimated that *quantum valebant* recovery for an implied contract may be available, such is not the case given the statutory limitations placed upon this Article I court."). The Federal Circuit has since indicated that *Amdahl's* reasoning may be applied by the trial judge in cases before the Court of Federal Claims. *See Gould, Inc. v. United States*, 67 F.3d at 930.

implied-in-fact contract may arise in "certain limited fact situations," *Prestex Inc. v. United States*, 162 Ct.Cl. at 628, 320 F.2d at 373, when a procurement statute or regulation is violated. *See Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1317 n. 9 (Fed.Cir.) (recognizing that *Amdahl* presents an exception to the general bar on *quantum meruit* claims), *reh'g en banc denied* (Fed.Cir.2011); *Int'l Data Prods. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed.Cir.2007) (same); *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1333 (Fed.Cir.2006); *Gould, Inc. v. United States*, 67 F.3d at 930; *Greg Pelland Constr. v. United* States, 833 F.2d 1022 (Fed.Cir.1987) (unpublished table decision); *cf. Perri v. United States*, 340 F.3d 1337, 1343 (Fed.Cir.2003) (explaining that an implied-in-fact contract may arise when a contractor provides goods or services to the government, but the government refuses to pay for the goods or services because of "defects in the contract that rendered it invalid or unenforceable"); *HTC Indus., Inc. v. Aspin*, 22 F.3d 1103 (Fed. Cir.) (unpublished table decision) (describing relief in similar circumstances as arising in equity), *cert. denied*, 513 U.S. 868, 115 S.Ct. 189, 130 L.Ed.2d 122 (1994). Although this court recognizes the general principle that a government agent must have authority to bind the government in its contractual relations in order to create an implied-in-fact contract, the court concludes that the violation of law implicated by the Seven Resorts' continued operations immediately after the expiration of the original concessions contract's term, the failure to issue a public notice as required by the 1965 Concessions Act, is similar to the violations at issue in *Prestex*, *Urban Data Systems*, and *Amdahl*, in that the violation of a procurement statute or regulation did not directly relate to the Regional Director's authority to bind the government in its contractual relations. *See Prestex Inc. v. United States*, 162 Ct.Cl. at 625, 320 F.2d at 371 (indicating that a contractor may recover under an implied-in-fact contract that has been fully performed even if the contract was "not properly advertised"); *see also N.Y. Mail & Newspaper Transp. Co. v. United States*, 139 Ct.Cl. 751, 757–60, 154 F.Supp. 271, 275–76 (allowing recovery on a quantum meruit basis when the failure to advertise a contract for the carriage of mail rendered "the execution of a contract without … advertisement … invalid"), *cert. denied*, 355 U.S. 904, 78 S.Ct. 332, 2 L.Ed.2d 260 (1957); *Ocean Tech., Inc. v. United States*, 19 Cl.Ct. 288, 293 (1990) (allowing recovery under an implied-in-fact contract after determining that a contract was awarded without valid competition). NPS' failure to issue a public notice indicating that Seven Resorts was authorized to continue operations immediately after the expiration of the original concessions contract's term, therefore, did not deprive the Regional Director of his likely authority to ratify the parties' relationship pursuant to the 1998 Letter Authorization. Although the parties did not enter into an express contract authorizing Seven Resorts' continuation of operations immediately after the expiration of the original concessions contract's term,[24] and the text of the 1998 Let-

24. One decision issued by the Federal Circuit distinguished the *Prestex* line of cases as "involv[ing] situations in which the plaintiff provided goods or services to the government pursuant to an express contract, but the government refused to pay for them because of defects in the contract that rendered it invalid or unenforceable." *See Perri v. United* States, 340 F.3d at 1344. The Federal Circuit stated that, in such circumstances, "it would be unfair to permit the government to retain the benefits of the bargain it had made…." *Id.* After recognizing that the Court of Federal Claims had found that the plaintiff had not shown "that there was either an express or implied-in-fact contract," that the government personnel involved had authority "to enter into such a contract," or that ratification had occurred, the Federal Circuit noted "we know of no case … in which either we, the Court of Claims, or the Court of Federal Claims has permitted quantum meruit recovery in the absence of *some* contractual arrangement between the parties." *Id.* at 1340, 1344. (emphasis added). Given that the Perri trial court held that the parties had not entered into an express or implied-in-fact contract, Perri does not appear to preclude an application of the *Prestex* line of cases to the above-captioned case, notwithstanding the distinction drawn by the Federal Circuit. The *Prestex* line of cases appears to depend on the existence of a general authority to contract as well as a mutual intent to contract, rather than the existence of an "express contract," because a violation of a procurement statute or regulation in the provision of goods or services to the government, in some circumstances, renders what may be characterized as an "express" contract "a nullity and void *ab initio*." *See Total Med. Mgmt., Inc. v. United States*, 104 F.3d at 1319

ter Authorization indicates that the parties believed Seven Resorts' continuation of operations during this period was governed by the original concessions contract, the parties' conduct indicates that they shared a mutual intent to contract under the terms of the original contract. *See Am. Tel. & Tel. Co. v. United States*, 177 F.3d at 1384 ("An implied-in-fact contract is a form of consensual contract, reflecting the basic requirements for such a contract including that of a meeting of the minds. It differs from the usual express contract only in that the terms, instead of being expressly stated by the parties, are derived from their conduct."); *United Int'l Investigative Servs. v. United States*, 26 Cl.Ct. 892, 900 (1992) ("Actual mental assent is not required for the formation of an implied-in-fact contract for a *quantum meruit* .... Instead, '[b]efore a contract may be implied-in-fact, there must be a meeting of the minds *which is inferred from the conduct of the parties*, and in the light of the surrounding circumstances, shows their tacit understanding.'" (emphasis and bracket in original) (quoting *Somali Dev. Bank v. United States*, 205 Ct. Cl. 741, 751, 508 F.2d 817, 822 (1974))).

Although the 1998 Letter Authorization likely ratified an implied-in-fact contract between the parties arising from Seven Resorts' continuation of operations immediately after the expiration of the original concessions contract's term, the parties' relationship under the 1998 Letter Authorization was governed by section 12(b) of the original concessions contract, rather than a new contract. A contract generally terminates at the expiration of its term. *See Waterloo Furniture Components, Ltd. v. Haworth, Inc.*, 467 F.3d 641, 646 (7th Cir.2006) ("[A]n expired contract releases all its parties from their respective contractual obligations." (citing *Advanced Plastics Corp. v. White Consol. Indus., Inc.*, 828 F.Supp. 484, 488 (E.D.Mich. 1993), *aff'd*, 47 F.3d 1167 (6th Cir.1995) (unpublished table decision))); *see also RMD, LLC v. Nitto Ams., Inc.*, No. 09–2056–JAR,

2012 WL 1033542, at *11 (D.Kan. Mar. 27, 2012) ("A contract that specifies the period of its duration generally terminates on the expiration of such period."); *Bartlett & Co., Grain v. Curry*, 1 Kan.App.2d 242, 563 P.2d 1096, 1101 (1977) (citation omitted); 17A Am. Jur.2d *Contracts* § 530. Individual provisions may survive a contract's expiration, but a provision's survival must be contemplated by the terms of the contract. *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 206, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991) ("[A]n expired contract has by its own terms released all its parties from their respective contractual obligations, except obligations already fixed under the contract but as yet unsatisfied."); *Monumental Life Ins. Co. v. Ill. Mut. Life Ins. Co.*, No. 11 C 8909, 2012 WL 5845631, at *3 (N.D.Ill. Nov. 19, 2012) (" '[A]bsent express savings language, it does not make sense that an option to renew a contract, contained in the same contract, which itself has a definite expiration date, could survive that expiration date. The right to renew exists only because the contract grants it, and therefore must expire when the contract expires, unless the contract itself provides that the renewal right survives the contract's expiration.' ") (alteration in original) (quoting *Prison Health Servs. v. Balt. Health Servs.*, 172 Md.App. 1, 912 A.2d 56, 64 (2006)); *All W. Pet Supply Co. v. Hill's Pet Prods. Div., Colgate–Palmolive Co.*, 847 F.Supp. 858, 861 (D.Kan.) ("If the contract expires on a particular date, the mutual obligations of the parties that comprise the contract of course also terminate on that date, unless the parties otherwise expressly provide in the contract."), *amended*, 842 F.Supp. 1376 (D.Kan.1994).

A provision that survives the expiration of a contract's term, therefore, may obligate a party to perform under the provision even after the contract in which it is contained has expired. *See John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 555, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964) ("We see no

(citing *United States v. Amdahl Corp.*, 786 F.2d at 392); *see also Am. Tel. & Tel. Co. v. United States*, 177 F.3d 1368, 1374 (Fed.Cir.1999) ("Invalidation of a contract is not a necessary consequence when a statute or regulation has been contra-

vened . . . ."). Although the original express concessions contract expired on December 31, 1998, the parties continued to maintain a mutual intent to contract throughout the time period relevant to the above-captioned case.

reason why parties could not if they so chose agree to the accrual of rights during the term of an agreement and their realization after the agreement had expired."); *see also Premier Corp. v. Econ. Research Analysts, Inc.,* 578 F.2d 551, 553–54 (4th Cir.1978) (noting that the expiration of a contract did not extinguish one party's obligation to indemnify losses that the other party incurred after the contract's expiration). Although the provisions that survive the expiration of a contract's term are typically " 'structural,' " *Wolff v. Westwood Mgmt. LLC,* 503 F.Supp.2d 274, 281 (D.D.C.2007) (quoting *Litton Fin. Printing Div. v. NLRB,* 501 U.S. at 208, 111 S.Ct. 2215), *aff'd,* 558 F.3d 517 (D.C.Cir.2009), the United States Supreme Court has recognized that the rights governed by structural provisions may also survive the expiration of a contract's term "under normal principles of contract interpretation." *See Litton Fin. Printing Div. v. NLRB,* 501 U.S. at 206, 111 S.Ct. 2215.

Although the 1998 Letter Authorization did not become effective until March 23, 1998, defendant argues that the 1998 Letter Authorization constituted an extension of the original concessions contract's term pursuant to section 12(b) of the original concessions contract. Defendant maintains that a comparison of section 12(a)(2) of the original concessions contract, a provision relating to compensation for Seven Resorts' possessory interest, to section 12(b), the original concessions contract's continuation clause, indicates that section 12(b) survived the contract's expiration. Section 12(a)(2) stated that Seven Resorts was entitled to book value if the Secretary, "during the term of this contract or upon its termination for any reason," determined that it was "desirable to discontinue the operations authorized" under the original concessions contract. Defendant maintains that section 12(a)(2) "signals that the phrase 'during the term of the contract,' . . . is not synonymous with the phrase 'upon its termination for any reason.' " According to defendant, "the phrase 'upon its termination for any reason' . . . is intended to describe and cover a period after the conclusion of the contract term." In support of this argument, defendant refers to definitions of the word "upon," which are "synonymous with either

'thereafter' or 'thereon.' " (citing *Merriam Webster's Collegiate Dictionary* 1294 (10th ed.2000); *see also Webster's Third New International Dictionary* 2518 (1964)). Defendant maintains that "the term 'upon', with its dual meaning, of thereafter and thereon, consciously builds into the parties' relationship the flexibility to address the uncertainties in the business environment within the National Parks." According to defendant, section 12(a)(2) "affords the NPS a window after termination to complete its decision making process, so that a concessioner is assured of receiving the appropriate measure of compensation for its possessory interest." Defendant argues that section 12(a)(2) "dovetails" with section 12(a)(3), which provided that "[p]ayment of the compensation provided for in this section will terminate the Concessioner's possessory interest," indicating that section 12(a)(3), "like Section 12(a)(2), contemplates a scenario in which not all aspects of the parties' business relationship are resolved as of the expiration and/or termination date of their contract." Defendant argues, therefore, that "Section 12(b) . . . is from the same mold" in that it can be read to provide "that, to avoid interruption of service to the public on *or after* the termination of its contract for any reason, the concessioner will continue its operations for a reasonable time if requested to do so by the Secretary." (emphasis in original). Defendant highlights that "[t]here is no requirement in the provision that the Secretary make the request that services be continued, let alone that the concessioner actually agree to the request, before the actual end of the contract period, in order for operations to be continued pursuant to Section 12(b)."

Seven Resorts agrees that the 1998 Letter Authorization was issued pursuant to section 12(b) of the original concessions contract and that section 12(b) survived the expiration of the original concessions contract's term. Seven Resorts, however, does not interpret section 12(b) to allow the Secretary to extend the original concessions contract's term. Seven Resorts highlights that section 12(b) "addressed the potential need to have an entity provide services in the transition period between the old contract and when a new

concessioner could take over operations under a new contract," and that section 12(b) "makes absolutely no reference to extending the termination date of the contract." Seven Resorts maintains that the use of the word "Interim" to describe the 1998 Letter Authorization, which was titled "Interim Letter of Authorization," and which the parties agree was issued pursuant to section 12(b), "demonstrates that the authorization was an authorization for operations *in between* the original and next contract, which would suggest it was intended to be a separate authorization." (emphasis in original). Seven Resorts also argues that the use of the phrase "Letter of Authorization" to describe the 1998 Letter Authorization suggests that the 1998 Letter Authorization "was separate from the original contract, albeit referenced in that contract." In support of its position that section 12(b) did not empower the Secretary to extend the original concessions contract's term, Seven Resorts notes that the 1999, 2000, and 2001 Letter Authorizations, which were purportedly issued pursuant to section 403(11)(A) of the 1998 Concessions Act, indicated that Seven Resorts' contract was "extended," which did not appear in the 1998 Letter Authorization but the 2002, 2003, 2004, 2005, 2006, 2007, and 2008 Letter Authorizations, which were exercised pursuant to section 12(b) of the original concessions contract, indicated that Seven Resorts was "authoriz[ed] . . . to continue operation" of visitor services, implicating a distinct contractual relationship.[25] Seven Resorts argues, therefore, although "the 1998 Letter Authorization, for all practical on-the-ground purposes, functioned as an extension of the original contract[,] . . . the language of the 1998 Authorization and the other facts highlighted by the Court make[ ] it clear that the parties were not extending the termination date pursuant to that authorization, but instead were entering into a new authorization to allow plaintiff to continue to conduct operations while NPS selected a successor."

The court agrees with the parties that section 12(b) of the original concessions contract survived the expiration of the original

concessions contract's term. Defendant is correct that section 12(b) does not require that "the Secretary make the request that services be continued, let alone that the concessioner actually agree to the request, before the actual end of the contract period, in order for operations to be continued pursuant to Section 12(b)." Instead, section 12(b) only indicates that the Secretary's request must be made "upon the termination of this contract for any reason." That the Secretary's request may be made at or near the expiration of the original concessions contract's term is consistent with the purpose of section 12(b), which is to govern the parties' relationship after the expiration of the original concessions contract's term. Under "normal principles of contract interpretation," therefore, section 12(b) "survive[d] expiration of the remainder of the agreement." *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. at 206, 111 S.Ct. 2215.

Contrary to defendant's position, however, just because the Secretary had the authority to request that Seven Resorts continue operations "upon the termination" of the original concessions contract does not mean that the Secretary had authority to extend the original concessions contract's term. Defendant argues that the parties' relationship after the expiration of the original concessions contract's term was governed by an "implied-in-fact contract extension," which was transformed into an express extension by the 1998 Letter Authorization. Defendant cites *Spencer v. Allpress Logging, Inc.*, 134 Idaho 856, 11 P.3d 475 (2000), an Idaho Supreme Court case for the proposition that "continued deliveries under the same terms and conditions past the date of [the] parties' original contract termination date, among other factors, evidence[s] [an] implied-in-fact contract extension." The facts of *Spencer v. Allpress Logging, Inc.*, however, are distinguishable from the facts of the above captioned case presently before the court. In *Spencer*, the performance required by the contract, the delivery of a set amount of logs, had not been completed by the time that the

**25.** Although not highlighted by Seven Resorts, the 1998 Letter Authorization, which the parties agree was issued pursuant to section 12(b) of the original concessions contract, similarly refers to Seven Resorts "continuation of services."

788

contract had expired. *See id.* at 479. The performing party continued to deliver logs pursuant to the terms of the original contract and the receiving party continued to pay for the performing party's deliveries. *See id.* The receiving party also referred to the continued delivery of logs as the performing party's attempt to "finish the contract." *Id.* (emphasis removed). The Idaho Supreme Court concluded that "[t]he conduct of the parties points overwhelmingly to the conclusion that they intended to extend the time for performing the contract." *Id.* Other than Seven Resorts' obligation to continue operations upon the request of the Secretary, there was no outstanding performance for Seven Resorts to complete upon the expiration of the original concessions contract's term. In addition, although the 1998 Letter Authorization indicated that Seven Resorts was "presently authorized" to conduct operations at Lake Mead Lodge, the plain text of section 12(b) of the original concessions contract indicated that the Secretary was permitted to request that Seven Resorts continue operations for a "reasonable time to allow the Secretary to select a successor," not that the Secretary had the authority to extend the original concessions contract's term. Regardless of the parties' intent after the expiration of the original concessions contract, therefore, section 12(b) could not be involved to extend the original concessions contract's term. Moreover, as indicated by Seven Reports' continued operation at Lake Mead Lodge, the Secretary did not select a successor to Seven Resorts during the 1998–99 timeframe.

Contrary to plaintiff's position, the parties' relationship under section 12(b) was not governed by a new contract. The authority granted by section 12(b) is analogous to the authority granted by an option. The United States Court of Appeals for the Federal Circuit has stated that "[o]bligations arising from the exercise of an option are part of a new contract only when the option was the principal subject matter of the bargain, *i.e.*,

an option contract." *See Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1275 (Fed.Cir.) (citing 3 Ric Mills Holmes, *Corbin on Contracts* § 11.1 (1996)), *reh'g and reh'g en banc denied*, 186 F.3d 1379 (Fed.Cir. 1999); *see also Int'l Bus. Invs., Inc. v. United States*, 21 Cl.Ct. 79, 80 (1990) (noting that options constitute new contracts only when "the exclusive, or at least the primary, purpose of the original contract was to obtain the option"); *Ocean Tech., Inc. v. United States*, 19 Cl.Ct. at 291. In *C.M.P., Inc. v. United States*, the United States Claims Court explained the relationship between obligations arising out of the exercise of an option and obligations created by an existing contract:

> Plaintiff argues that an option is a contract in which one of the contracting parties holds an inchoate power to bring into being a second contract through acceptance of an offer that contractually has been rendered irrevocable under certain conditions.... Plaintiff misconceives the nature of the contractual relationship.... The options are essential parts of the total contractual relationship and are in no sense severable from the initial term as far as the obligations of the parties are concerned.... The exercise of an option in an existing *contract is not equivalent to the award of a new and different contract;* it is an element in the continuation of a unitary contract package.

*C.M.P., Inc. v. United States*, 8 Cl.Ct. 743, 746 (1985) (emphasis added); *see also VHC, Inc. v. Peters*, 179 F.3d 1363, 1366 (Fed.Cir. 1999); *Jackson v. United States Postal Serv.*, 799 F.2d 1018, 1022 (5th Cir.) (" '[A] lessee's exercise of [an option to renew a lease] leaves the existing lease intact ....'" (alterations in original) (quoting 1A *Corbin on Contracts* § 264 p. 530 (1963))), *reh'g denied*, 803 F.2d 717 (5th Cir.1986) (unpublished table decision). This guidance is applicable to government contracts, in which options typically "create extensions [26] of the obligations

---

**26.** The Federal Acquisition Regulation (FAR) currently defines an option as a "unilateral right in a contract by which, for a specified time, the Government ... may elect to extend the term of the contract." *See* 48 C.F.R. § 2.101 (2012).

The FAR's definition, however, does not describe the nature of section 12(b) of the original concessions contract. By its terms, section 12(b) provided for a continuation of operations "for a reasonable time to allow the Secretary to select a

of the original contract rather than new, independent obligations." *Fluor Enters., Inc. v. United States,* 64 Fed.Cl. 461, 487 n. 26 (2005) (citing *Alliant Techsystems, Inc. v. United States,* 178 F.3d at 1275–76); *see also Telex Commc'ns, Inc. v. United States,* 40 Fed.Cl. 703, 708–09 (1998) (holding that the use of purchase orders to exercise an option in a government contract does not create a new contract when the purchase orders "depend for their existence on the underlying contract"), *dismissed,* 168 F.3d 1317 (Fed. Cir.1998) (unpublished table decision).

NPS could not find evidence of issuing a public notice relating to the 1998 Letter Authorization, but NPS was not required to issue a public notice of the 1998 Letter Authorization under the 1965 Concessions Act. *See §§* 4, 5, 79 Stat. at 970. The 1965 Concessions Act provided that, "before granting extensions, renewals or new contracts ... the Secretary shall give reasonable public notice of his intention so to do...." *See §* 5, 79 Stat. at 970. That NPS issued the 1998 Letter Authorization as a temporary measure "to assure the continuation of the services being offered at Lake Mead National Recreation Area under Concession Contract No. CC–LAME003–74," [the original concessions contract] indicates that the parties' relationship under the 1998 Letter Authorization was governed by section 12(b) of the original concessions contract, rather than an extension or renewal of the original concessions contract's term or a new concessions contract.

That the parties' relationship was governed by section 12(b) of the original concessions contract after the effective date of the 1998 Letter Authorization, which Seven Resorts accepted on March 23, 1998, however, does not indicate that the original concessions contract survived the expiration of its term. *See Litton Fin. Printing Div. v.*

*N.L.R.B.,* 501 U.S. at 206, 111 S.Ct. 2215 (indicating with respect to an expired collective-bargaining agreement that "obligations already fixed under the contract but as yet unsatisfied" can survive the contract's expiration, but noting that "after expiration most terms and conditions of employment ... no longer have force by virtue of the contract" (citing *Office & Prof'l Emps. Trust Fund v. Laborers Fund Admin. Office of N. Cal., Inc.,* 783 F.2d 919, 922 (9th Cir.1986) ("An expired CBA [collective-bargaining agreement] itself is no longer a 'legally enforceable document.'" (citation omitted)))); *Nolde Bros. v. Local No. 358,* 430 U.S. 243, 251–53, 97 S.Ct. 1067, 51 L.Ed.2d 300 (recognizing that an arbitration clause can create a contractual obligation to arbitrate after the expiration of a contract's term, which is not altered by the expiration of the contract), *reh'g denied,* 430 U.S. 988, 97 S.Ct. 1689, 52 L.Ed.2d 384 (1977); *see also Zucker v. After Six, Inc.,* 174 Fed.Appx. 944, 947 (6th Cir. 2006) ("Although *Litton...* [and] *Nolde Bros....* involved collective bargaining agreements, their holdings are based upon principles applicable to arbitration agreements generally, and their application need not be limited to the collective bargaining context."); *Basketball Mktg. Co. v. Urbanworks Entm't,* No. Civ. A. 04–CV–3179, 2004 WL 2590506, at *4–5 (E.D.Pa. Nov. 10, 2004) ("Despite this Court's concerns with applying the *Litton* standard by analogy to general commercial agreements, this Court finds the logic expressed in *Litton* applicable to general contracts."). Although the 1998 Letter Authorization was issued pursuant to the original concessions contract, the 1998 Letter Authorization did not extend the original concessions contract's term after its expiration or constitute the award of a new concessions contract.

successor," rather than an extension of the original concessions contract's term. Moreover, it is unclear whether the FAR applies to concessions contracts. *See* 36 C.F.R. § 51.3 (2013) ("Concessions contracts ... are not service or procurement contracts within the meaning of statutes, regulations or policies that apply only to federal service contracts or other types of federal procurement actions."); *see also Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior,* 142 F.Supp.2d

54, 80 (D.D.C.), *opinion amended* 150 F.Supp.2d 96 (D.D.C.2001), *aff'd in part, rev'd in part* 282 F.3d 818 (D.C.Cir.), *cert. granted* 537 U.S. 1018, 123 S.Ct. 549, 154 L.Ed.2d 424 (2002), *and vacated by* 538 U.S. 803, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003); *Crystal Cruises, Inc.,* B–238347.2, 90–1 C.P.D. ¶ 560 (June 14, 1990); *Stephen Sloan Marine Corp.,* B–234219, 89–1 C.P.D. ¶ 435 (May 9, 1989).

After issuing the 1998 Letter Authorization, NPS continued to allow Seven Resorts to continue operations after the passage of the 1998 Concessions Act. Unlike the 1998 Letter Authorization, which became effective before the passage of the 1998 Concessions Act, the 1999, 2000, and 2001 Letter Authorizations were purportedly issued pursuant to Secretary's authority under the 1998 Concessions Act to award an extension to an existing concessions contract without issuing a public solicitation. The 1999 Letter Authorization stated: "[P]ursuant to section 403(11) of P.L. 105-391 [the 1998 Concessions Act], and upon return of a signed copy of this letter agreement to the undersigned, your Concession Contract No. CC-LAME003-74 and Concession Contract No. CC-LAME010-71 are hereby extended...." The 2000 and 2001 Letter Authorizations contained similar language, and the 2001 Letter Authorization specifically referred to implementing regulations that authorized NPS to issue an extension to existing concessions contracts without issuing a public solicitation. In addition, the public notice corresponding to the 2001 Letter Authorization stated: "Pursuant to 36 CFR 51.23, public notice is hereby given that the National Park Service proposes to *extend* the following expiring concession contracts for a period of up to one year." Extension of Expiring Contracts u? to One Year, 65 Fed.Reg. 75,296, 75,296, 75,298 (Dec. 1, 2000) (emphasis added).[27] Similar to the 1998 Letter Authorization, the 1999, 2000, and 2001 Letter Authorizations did not extend the original concessions contract's term after its expiration.[28] *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. at 206, 111 S.Ct. 2215 ("[A]n expired contract has by

its own terms released all its parties from their respective contractual obligations, except obligations already fixed under the contract but as yet unsatisfied."). Although NPS treated the 1999, 2000, and 2001 Letter Authorizations as extensions to the original concessions contract, the original concessions contract had expired on December 31, 1997.

Section 403(11) of the 1998 Concessions Act, the authority on which NPS relied to issue the 1999, 2000, and 2001 Letter Authorizations, also grants the Secretary authority to award a "temporary concessions contract" without issuing a public solicitation. *See* § 403(11)(A), 112 Stat. at 3507-08. The record indicates, however, that NPS did not invoke this authority to issue the 1999, 2000, and 2001 Letter Authorizations because NPS affirmatively treated each Letter Authorization as an extension of the original concessions contract, rather than as the award of a temporary concessions contract. That an alternative basis existed on which the Secretary could have awarded a new concessions contract to Seven Resorts for the periods covered by the 1999, 2000, and 2001 Letter Authorizations indicates that NPS may have had authority to enter into a contractual relationship with Seven Resorts during the relevant time period, but NPS did not invoke that authority in issuing the 1999, 2000, and 2001 Letter Authorizations.

Although the 1999, 2000, and 2001 Letter Authorizations did not constitute valid extensions of the original concessions contract, they evidenced the parties' mutual intent to contract. Unlike the 1965 Concessions Act, however, the 1998 Concessions Act precludes, according to NPS' implementing reg-

**27.** NPS did not issue a similar public notice of the issuance of the 1999 and 2000 Letter Authorizations because the implementing regulations to the 1998 Concessions Act that required NPS to issue a public notice were not promulgated until after NPS had issued the 1999 and 2000 Letter Authorizations. *See* Concession Contracts, 65 Fed.Reg. 20,668, 20,673 (Apr. 17, 2000).

**28.** Plaintiff maintains that the 1999 Letter Authorization extended the 1998 Letter Authorization. Plaintiff appears to believe that the 1999 Letter Authorization became effective when Seven Resorts' President placed the signed 1999 Letter Authorization in the mail, but the date relevant to the court's analysis is the date on

which NPS received the 1998 Letter Authorization because the 1999 Letter Authorization explicitly stated that it became effective "upon return of a signed copy of this letter agreement to the undersigned [the NPS Regional Director]." *See* Restatement (Second) Contracts § 63 (*"Unless the offer provides otherwise...* an acceptance ... is operative ... as soon as put out of the offeree's possession." (emphasis added)). That the 1999 Letter Authorization became effective after the expiration of the 1998 Letter Authorization indicates that the 1999 Letter Authorization could not constitute an extension of the 1998 Letter Authorization.

ulations, implied-in-fact contracts from constituting concessions contracts. Section 403 of the 1998 Concessions Act provides that, "except as provided by this title or otherwise authorized by law, the Secretary *shall utilize concessions contracts* to authorize a person, corporation or other entity to provide accommodations, facilities, and services to visitors to units of the National Park System." § 403, 112 Stat. at 3504 (emphasis added). As noted above, NPS specifically amended its proposed implementing regulations to clarify that an implied-in-fact contract does not constitute a concessions contract under the 1998 Concessions Act. *See* Concession Contracts, 65 Fed.Reg. 20,630–01, 20,634 (Apr. 17, 2000) ("The general concessioner organization requested clarification of this definition ['Concession Contract (or Contract)'] with respect to when a concession contract can be something other than a written agreement. NPS has deleted the phrase 'unless otherwise indicated in this part' in response to this comment."). Although the Regional Director may have had general authority, whether express or implied, to bind the government in its contractual relations under the 1965 Concessions Act, the text of the 1998 Concessions Act, when read in conjunction with NPS' implementing regulations, indicates that the Regional Director likely lacked the general authority to enter into or ratify an implied-in-fact contract under the 1998 Concessions Act, thereby preventing the creation of an implied-in-fact contract unlike the 1998 Letter Authorization, which was issued in violation of procedural requirements, established under the 1965 Concessions Act, the Regional Director lacked the general authority to enter into implied-in-fact contract, under the 1998 Concessions Act.[29]

After issuing the 2001 Letter Authorization, NPS believed that it no longer had authority under the 1998 Concessions Act to award a new concessions contract or extend an existing concessions contract without issuing a public solicitation. NPS, therefore, once again invoked section 12(b) of the origi-

nal concessions contract to issue the 2002, 2003, 2004, 2005, 2006, 2007, and 2008 Letter Authorizations. Like the 1998 Letter Authorization, NPS characterized the 2002, 2003, 2004, 2005, 2006, 2007, and 2008 Letter Authorizations as "continuation[s]" of operations under the terms and conditions of the original concessions contract. Unlike the 1998 Letter Authorization, however, the 2002, 2003, 2004, 2005, 2006, 2007, and 2008 Letter Authorizations were issued more than four years after the expiration of the original concessions contract's term.

The court agrees with defendant that the passage of the 1998 Concessions Act did not prevent NPS from invoking section 12(b) of the original concessions contract because the passage of the 1998 Concessions Act did not "affect the validity" of a concessions contract or permit entered into under the 1965 Concessions Act, and the provisions of the 1998 Concessions Act applied "to any such contract or permit except to the extent such provisions are inconsistent with the terms and conditions of any such contract or permit." *See* § 415, 112 Stat. at 3515. Section 12(b) of the original concessions contract stated in relevant part:

> To avoid interruption of service to the public upon the termination of this contract for any reason, the Concessioner, upon the request of the Secretary, will (1) continue to conduct the operations authorized hereunder for a reasonable time to allow the Secretary to select a successor, or (2) consent to the use by a temporary operator designated by the Secretary of the concessioner's improvements and personal property, not including current or intangible assets, used in the operations authorized hereunder upon fair terms and conditions. . . .

The Secretary's authority under section 12(b) was contingent on satisfying the purpose of "avoid[ing] interruption of service to the public upon the termination of this contract for any reason." The specific language of sec-

---

**29.** Even if the issuance of the 1999, 2000, and 2001 Letter Authorizations created a series of implied-in-fact contracts under *Prestex, Urban Data Systems,* and *Amdahl,* Seven Resorts was not "awarded a new concessions contract ...

replacing an existing concessions contract" under the 1998 Concessions Act because implied-in-fact contracts do not constitute concessions contracts under the 1998 Concessions Act.

tion 12(b), therefore, precluded its invocation in the 2002 Letter Authorization and each subsequent Letter Authorization, which were issued more than four years after the expiration of the original concessions contract's term.

Defendant argues that "Section 12(b) empowers the parties to continue their contract *at any time* on or after its termination for any reason, to include expiration, in order to prevent an interruption of service." (emphasis added). Defendant maintains that the issuance of the 2002, 2003, 2004, 2005, 2006, 2007, and 2008 Letter Authorizations pursuant to section 12(b) constituted "the essence of preventing an interruption of services to the public" because the operations at Lake Mead Lodge would have "come to an abrupt end" had Seven Resorts not been authorized to continue operations at Lake Mead Lodge. Defendant concludes, "[t]hat the NPS invoked 16 U.S.C. § 5952(11) [the codification of Section 403(11) of the 1998 Concessions Act] as a basis for extending the parties' contract from 1999 through 2001, and Section 12(b) thereafter should be of no consequence to this analysis."

Defendant's argument that section 12(b) could be exercised at any point after the expiration of the original concessions contract's term "to avoid interruption of service to the public," however, ignores that section 12(b) expressly stated that it was to be exercised "to avoid interruption of service to the public *upon the termination of this contract* for any reason." (emphasis added). As indicated above, the court agrees with the parties that NPS validly invoked section 12(b) approximately three months after the expiration of the original concessions contract's term in the form of the 1998 Letter Authorization, which allowed Seven Resorts to continue operations in close proximity to the expiration of the original concessions contract's term. After NPS had issued the 1999, 2000, and 2001 Letter Authorizations, however, neither the 2002 Letter Authorization nor any subsequent Letter Authorization could be said to have been issued for the purpose of avoiding interruption of service to the public "upon the termination" of the original concessions contract. NPS could not exercise section 12(b) of the original conces-

sions contract more than four years after the expiration of the original concessions contract's term. The court, therefore, concludes that NPS invalidly relied on section 12(b) to issue the 2002, 2003, 2004, 2005, 2006, 2007, and 2008 Letter Authorizations.

In fact, NPS issued the 2002, 2003, 2004, 2005, 2006, 2007, and 2008 Letter Authorizations pursuant to section 12(b) of the original concessions contract under the mistaken impression that it had extended the original concessions contract to the maximum extent possible under the 1998 Concessions Act. Given that NPS' reliance on section 12(b) of the original concessions contract was invalid, NPS lacked authority under the 1998 Concessions Act to authorize Seven Resorts to continue operations under the 1998 Concessions Act without issuing a public solicitation or invoking section 403(11) of the 1998 Concessions Act to award a new concessions contract. As indicated above, with respect to the 1999, 2000, and 2001 Letter Authorizations, NPS also likely lacked authority to enter into an implied-in-fact contract under the 1998 Concessions Act during the time periods covered by the 2002, 2003, 2004, 2005, 2006, 2007, and 2008 Letter Authorizations. *See* § 403, 112 Stat. at 3504.

▆ Regardless of whether the parties' relationship under the 2002, 2003, 2004, 2005, 2006, 2007, and 2008 Letter Authorizations was governed by an implied-in-fact contract, however, and even though Seven Resorts continued to conduct operations at Lake Mead Lodge until December 31, 2008, Seven Resorts was not "awarded a new concessions contract ... replacing an existing concessions contract" under the 1998 Concessions Act because NPS and Seven Resorts did not enter into a valid, written agreement pursuant to a public solicitation or NPS' invocation of section 403(11) of the 1998 Concessions Act at any point relevant to the above-captioned case. *See* 36 C.F.R. § 51.3 (2000) ("A concession contract (or contract) means a binding written agreement between the Director and a concessioner....."). The possessory interest that Seven Resorts obtained pursuant to the original concessions contract, therefore, was not converted into a leasehold

surrender interest under the 1998 Concessions Act. *See* § 405(b)(2), 112 Stat. at 3509.

*Valuation of Seven Resorts' Possessory Interest*

■ Because the 1998 Concessions Act's provision for a leasehold surrender interest is not implicated in the above-captioned case, the only remaining issue to be resolved in the parties' cross-motions for partial summary judgment is whether the possessory interest that Seven Resorts obtained under the original concessions contract pursuant to the 1965 Concessions Act should be measured by sound value or book value. As an initial matter, the court notes that the passage of the 1998 Concessions Act did not have an impact on Seven Resorts' possessory interest. Although, as explained below, Seven Resorts' claim arose after the passage of the 1998 Concessions Act, Seven Resorts obtained its possessory interest under the original concessions contract, which was issued under the 1965 Concessions Act. The 1998 Concessions Act provides that its repeal of the 1965 Concessions Act "shall not affect the validity of any concessions contract or permit entered into under such Act, but the provisions of this title shall apply to any such contract or permit except to the extent such provisions are inconsistent with the terms and conditions of any such contract or permit." § 415(a), 112 Stat. at 3515. With respect to a concessioner that has not been "awarded a new concessions contract ... replacing an existing concessions contract," the 1998 Concessions Act provides:

> A concessioner which has obtained a possessory interest as defined pursuant to Public Law 89–249 [the 1965 Concessions Act] ... as in effect on the day before the date of the enactment of this Act [the 1998 Concessions Act], under the terms of a concession contract entered into before that date [the date of the 1998 Concessions Act's enactment] shall, upon the expiration or termination of such contract, be entitled to receive compensation for such possessory interest improvements in the amount and manner as described by such concessions contract. Where such a possessory interest is not described in the existing contract, compensation of possessory inter-

est shall be determined in accordance with the laws in effect on the day before the date of enactment of this Act.

§ 405(b), 112 Stat. at 3509. Because Seven Resorts obtained its possessory interest under a contract entered into before the passage of the 1998 Concessions Act, the 1998 Concessions Act provides that Seven Resorts was entitled to "receive compensation" for its possessory interest upon the original concessions contract's expiration to the extent that its possessory interest was "described" in the original concessions contract. To the extent that Seven Resorts possessory interest was "not described" in the original concessions contract, then the measure of Seven Resorts' possessory interest is to be determined under the 1965 Concessions Act as prescribed by section 405(b) of the 1998 Concessions Act.

The 1998 Concessions Act uses the word "described" to differentiate between two, alternative scenarios: (1) when a concessioner receives "possessory interest compensation ... in the *amount and manner as described*" in an existing concessions contract, and (2) when a concessioner receives "compensation of possessory interest ... in accordance with the laws in effect on the day before the date of enactment" of the 1998 Concessions Act "[w]here such a possessory interest is not described in the existing contract." *See* § 405(b)(1), 112 Stat. at 3509 (emphasis added). The 1998 Concessions Act's description of these two scenarios indicates that, when the "amount and manner" of compensation for a concessioner's possessory interest is not provided for in an existing concessions contract, the concessioner is to be compensated according to the 1965 Concessions Act. *See id.* The court concludes, therefore, that the meaning of the word "described," when placed in context, requires the court to refer to an existing concessions contract only when the contract provides a means for calculating the "amount and manner" of compensation for a concessioner's possessory interest. That the court is to refer to the existing concessions contract only when the "amount and manner" of compensation for a concession's possessory interest is "described" in the existing concessions contract, and other-

wise is to refer to the 1965 Concessions Act, is also consistent with the 1965 Concessions Act's provision for sound value "[u]nless otherwise provided by agreement of the parties." *See* § 6, 79 Stat. at 970.

Contract interpretation is a question of law, which poses an appropriate question for summary judgment resolution. *See First Annapolis Bancorp, Inc. v. United States,* 644 F.3d 1367, 1373 (Fed.Cir.2011), *cert. denied,* ⸺ U.S. ⸺, 132 S.Ct. 2102, 182 L.Ed.2d 882 (2012); *H.B. Mac, Inc. v. United States,* 153 F.3d 1338, 1345 (Fed.Cir. 1998) (stating that matters of contract interpretation are questions of law); *see also Holland v. United States,* 621 F.3d 1366, 1374 (Fed.Cir.2010); *Dalton v. Cessna Aircraft Co.,* 98 F.3d 1298, 1305 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (Fed. Cir.1996); *C.W. Over & Sons, Inc. v. United States,* 54 Fed.Cl. 514, 520 (2002). Contract interpretation starts with analysis of the language of the written agreement. *See Precision Pine & Timber, Inc. v. United States,* 596 F.3d 817, 824 (Fed.Cir.2010), *cert. denied,* ⸺ U.S. ⸺, 131 S.Ct. 997, 178 L.Ed.2d 826 (2011); *LAI Servs., Inc. v. Gates,* 573 F.3d 1306, 1314 (Fed.Cir.), *reh'g denied* (Fed.Cir.2009); *Barron Bancshares, Inc. v. United States,* 366 F.3d 1360, 1375 (Fed.Cir.2004); *Foley Co. v. United States,* 11 F.3d 1032, 1034 (Fed.Cir.1993); *Sterling, Winchester & Long, L.L.C. v. United States,* 83 Fed.Cl. 179, 183 (2008), *aff'd,* 326 Fed. Appx. 568 (Fed.Cir.2009). The United States Court of Appeals for the Federal Circuit stated in *Jowett, Inc. v. United States:*

> In interpreting a contract, "[w]e begin with the plain language." "We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." In addition, "[w]e must interpret the contract in a manner that gives meaning to all of its provisions and makes sense."

*Jowett Inc. v United States,* 234 F.3d 1365, 1368 (Fed.Cir.2000) (quoting *McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (Fed.Cir.1996); *Harris v. Dep't of Veterans Affairs,* 142 F.3d 1463, 1467 (Fed.Cir.1998)); *see also McHugh*

*v. DLT Solutions, Inc.,* 618 F.3d 1375, 1380 (Fed.Cir.2010); *Giove v. Dep't of Transp.,* 230 F.3d 1333, 1340–41 (Fed.Cir.2000) ("In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense. Further, business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs.") (citations omitted); *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991) (indicating that a preferable interpretation of a contract is one that gives meaning to all parts of the contract rather than one that leaves a portion of the contract "useless, inexplicable, void, or superfluous"); *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 388, 351 F.2d 972, 975 (1965) (The language of the "contract must be given that meaning that would be derived from the contract by a reasonable intelligent person acquainted with the contemporaneous circumstances."); *Marquardt Co. v. United States,* 101 Fed.Cl. 265, 269 (2011) ("In interpreting contractual language, the court must give reasonable meaning to all parts of the contract and avoid rendering portions of the contract meaningless." (citation omitted)); *Enron Fed. Solutions, Inc. v. United States,* 80 Fed.Cl. 382, 393 (2008) ("[C]ontext defines a contract and the issues deriving thereof."). " ' "In contract interpretation, the plain and unambiguous meaning of a written agreement controls." The contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract.' " *Arko Exec. Servs., Inc. v. United States,* 553 F.3d at 1379 (quoting *Hercules Inc. v. United States,* 292 F.3d 1378, 1380– 81 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir.2002) (quoting *Craft Mach. Works, Inc. v. United States,* 926 F.2d 1110, 1113 (Fed.Cir.1991))); *see also Gardiner, Kamya & Assocs., P.C. v. Jackson,* 467 F.3d 1348, 1353 (Fed.Cir.2006) (citations omitted); *Medlin Constr. Grp., Ltd. v. Harvey,* 449 F.3d 1195, 1200 (Fed.Cir.2006) (reviewing the contract as a whole to determine the meaning of relevant provisions); *Hunt Constr. Grp., Inc. v. United States,* 281 F.3d 1369, 1372 (Fed. Cir.2002) ("We begin with the plain language when interpreting a contract.... The contract must be considered as a whole and interpreted to effectuate its spirit and pur-

pose, giving reasonable meaning to all parts." (citations omitted)); *LAI Servs., Inc. v. Gates*, 573 F.3d at 1314. The Federal Circuit also has indicated that "a proper technique of contract interpretation is for the court to place itself into the shoes of a reasonable and prudent contractor and decide how such a contractor would act in interpreting the contract." *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed.Cir.1998).

Section 5(b) of the original concessions contract provided the following with respect to the creation of Seven Resorts' possessory interest in the facilities at Lake Mead Lodge:

> It is the intention of the parties that the Concessioner shall have a possessory interest in all concessioner's improvements consisting of all incidents of ownership, except legal title which shall be vested in the United States.... The said possessory interest shall not be extinguished by the expiration or other termination of this contract, and may not be terminated or taken for public use without just compensation.... Performance of the obligations assumed by the Secretary under Section 12 herein shall constitute just compensation in the circumstances therein described.

Section 12(a)(1) of the original concessions contract provided in relevant part:

> If for any reason, the Concessioner shall cease to be authorized to conduct the operations authorized hereunder, or any of them, and thereafter such operations are to be conducted by a successor, whether a private person or an agency of the government, (i) the Concessioner will sell and transfer to the successor designated by the Secretary its possessory interest in concessioner's improvements and all other property of the Concessioner used or held for use in connection with such operations, and (ii) the Secretary will require such successor, as a condition to the granting of a permit or contract to operate, to purchase from the Concessioner such possessory interest and other property, and to pay the Concessioner the fair value thereof. The fair value of a possessory interest shall be deemed to be the sound value of the improvement to which it relates at the time

of transfer of such possessory interest, without regard to the term of the contract. The sound value of any structure, fixture, or improvement shall be determined upon the basis of reconstruction cost less depreciation evidenced by its condition and prospective serviceability in comparison with a new unit of like kind, but not to exceed fair market value.

Section 12(a)(2) of the original concessions contract further provided:

> If the Secretary shall determine that, during the term of this contract or upon its termination for any reason, it is desirable to discontinue the operations authorized hereunder, or any of them, and/or to abandon, remove, or demolish any of the concessioner's improvements, then the Secretary will, before making such determination effective, take such action as may be necessary to assure the Concessioner of compensation (i) for its possessory interest in such improvements in the amount of their book value, provided that is such an improvement is to be replaced by the Concessioner then such compensation shall be the sound value thereof determined as provided in subsection (a)(1) of this section; (ii) for the cost of restoring the land to a natural condition; (iii) for the cost of transporting to a reasonable market for sale such moveable property of the Concessioner as may be made useless by such determination; and (iv) for the actual cost to the Concessioner of such removal or demolition, less salvage resulting therefrom.

Section 12(a)(3) provided:

> Payment of the compensation provided for in this section will terminate the Concessioner's possessory interest in the improvements to which it relates and will constitute just compensation for the termination or taking of such possessory interest. The Concessioner relinquishes and waives any right of compensation for any possessory interest in any alterations, additions, or improvements to government improvements heretofore or hereafter provided by the Concessioner.

Under the original concessions contract, therefore, Seven Resorts' possessory interest

was not to be "terminated or taken" without "just compensation," which was measured by sound value when a successor concessioner took over the operations authorized under the original concessions contract and book value when the Secretary determined during the original concession's contract's term, or "upon its termination for any reason," that it was "desirable to discontinue the operations authorized" under the original concessions contract.

The provisions quoted immediately above also indicate that Seven Resorts' possessory interest was not "extinguished by the expiration or other termination" of the original concessions contract and that Seven Resorts was entitled to receive "just compensation" if its possessory interest was "taken for public use." Defendant maintains that "the relevant date of value must of necessity be December 31, 2008, the date on which Seven Resorts actually ceased operations at Lake Mead Lodge and further concessions operations were discontinued at that location." (footnote omitted). Seven Resorts similarly identifies December 31, 2008 as the date relevant to the court's analysis, noting that "the government continued to accept fees from plaintiff pursuant to the legal authorization it claimed was in existence and no transfer or taking occurred until December 31, 2008." Defendant concedes that "[e]ven if the Court were to conclude that Seven Resorts were entitled to sound value ... the relevant date of valuation would still be December 31, 2008 ... because December 31, 2008 is the only valuation date that would most fairly reflect the value of the benefit received by the Government from concessioner operations...." The court agrees with

the parties that the date on which Seven Resorts' possessory interest should be valued is December 31, 2008, the date on which Seven Resorts discontinued its operations at Lake Mead Lodge. Although the original concessions contract expired on December 31, 1997, Seven Resorts continued to occupy the premises pursuant to a series of successive Letter Authorizations until December 31, 2008. Seven Resorts' claim, therefore, arose on December 31, 2008, the date on which defendant took possession of Seven Resorts' property without paying Seven Resorts just compensation. *See Fordyce v. United States,* 7 Cl.Ct. 591, 595 n.2 (1985) (measuring the date of a taking under the 1965 Concessions Act as "the date plaintiffs surrendered their interest in the bathhouse to the National Park Service").[30]

Although section 5(b) of the original concessions contract provided that "[p]erformance of the obligations assumed by the Secretary under Section 12 herein shall constitute just compensation in the circumstances therein described," neither of the circumstances set forth in section 12 described the course of the parties' relationship after the expiration of the original concessions contract. Section 12 provided a measure of compensation for Seven Resorts' possessory interest in two circumstances: (1) when the operations that Seven Resorts conducted under the original concessions contract were taken over by a successor, and (2) when the Secretary made a determination to "discontinue the operations" during the contract's term or "upon its termination for any reason." Seven Resorts was not replaced by a successor.[31] In addition, the Secretary did not

---

**30.** The court recognizes that the 1998 Concessions Act provides that a concessioner is entitled to compensation for a possessory interest it obtained pursuant to a contract entered into under the 1965 Concessions Act "upon the expiration or termination of such contract." *See* § 405(b), 112 Stat. at 3509. As indicated below, however, Seven Resorts' compensation for its possessory interest is determined under the 1965 Concessions Act, which measures the value of Seven Resorts' possessory interest "at the time of taking by the United States," in this case December 31, 2008, rather than at the expiration of the original concessions contract's term. *See* § 6, 79 Stat. at 970. The 1965 Concessions Act also provides

that a possessory interest created under a concessions contract "shall not be extinguished by the expiration or other termination of the contract." *See id.; see also* 111 Cong. Rec. 23,634 (1965) (statement of Rep. Brooks) (noting with respect to the precursor to the 1965 Concessions Act: "Under this bill the concessioner's possessory interest would extend beyond the period of his contract and, indeed, in perpetuity unless it is bought back by the U.S. Government....").

**31.** Although defendant took possession of Seven Resorts' facilities on December 31, 2008, and plaintiff no longer has permission to continue operations on site, Seven Resorts acknowledges

make a determination to "discontinue the operations" upon the contract's expiration. As indicated above, when the original concessions contract expired on December 31, 1997, the parties' relationship was likely governed by an implied-in-fact contract, followed by the 1998 Letter Authorization. The Secretary did not make a final determination to "discontinue the operations" until 2007 or 2008.[32] The Secretary's decision to "discontinue the operations," therefore, did not occur during the term of the original concessions contract or "upon its termination for any reason." As indicated above with respect to the 2002, 2003, 2004, 2005, 2006, 2007, and 2008 Letter Authorizations, the phrase "upon its termination for any reason" cannot reasonably be interpreted to allow the Secretary to make a determination to discontinue operations approximately eleven years after the original concessions contract's term had expired. *See RMD, LLC v. Nitto Ams., Inc.,* 2012 WL 1033542, at *11 ("A contract that specifies the period of its duration generally terminates on the expiration of such period."); *Bartlett & Co., Grain v. Curry,* 563 P.2d at 1101 (citation omitted); 17A Am. Jur.2d *Contracts* § 530.

Defendant attempts to dismiss the large period of time between the expiration of the original concessions contract's term and the Secretary's determination to discontinue operations, stating:

> [O]ne need look no further than Seven Resorts's own contemporaneous conduct in its relationship with the NPS, consisting of seven years of unequivocal agreements to extended performance by both parties, moving the effective termination date of the parties' contract, and the time when the Secretary should decide the property's ultimate disposition, forward to the actual time when Seven Resorts ceased performance in 2008.

Defendant argues that "the timing of the termination in question has no role," and that the phrase "upon termination for any reason" allows the Secretary to make a determination to discontinue operations "at some point 'thereafter,'" without accounting for whether the determination was made in close proximity to the termination date of the original concessions contract. (quoting *Merriam Webster's Collegiate Dictionary* 1294 (10th ed. 2000)). Although defendant provides the court with alternative definitions of the word "upon," defendant does not address the effect of the alternative definitions provided, which include: "'immediately following on; very soon after'" or "'on the occasion of; at the time of.'" (quoting *Merriam Webster's Collegiate Dictionary* 1294 (10th ed. 2000)). Contrary to defendant's position, the court concludes that the termination date of the original concessions contract is relevant to the court's analysis of the Secretary's invocation of section 12(b) of the original concessions contract. Instead of making a determination to discontinue operations "upon the termination" of the original concessions contract, the Secretary attempted to authorize Seven Resorts to continue operations pursuant to the 2002 Letter Authorization approximately four years after the expiration of the original concessions contract's term. As indicated above, none of the Letter Authorizations issued by NPS had the effect of extending the term of the original concessions contract. *See Litton Fin. Printing Div. v. NLRB,* 501 U.S. at 206, 111 S.Ct. 2215; *see also All W. Pet Supply Co. v. Hill's Pet Prods. Div., Colgate–Palmolive Co.,* 847 F.Supp. at 861 ("If the contract expires on a particular date, the mutual obligations of the parties that comprise the contract of course also terminate on that date, unless the parties otherwise expressly provide in the contract."). The court, therefore, agrees with Seven Resorts that the original

that defendant's actions on that date did not constitute the conduct of operations by a "successor."

**32.** The July 5, 2007 letter from NPS to Seven Resorts indicates that the Secretary made an initial determination to discontinue operations in 2007. NPS' subsequent issuance of the 2008 Letter Authorization, however, indicates that the

Secretary did not make any decision to discontinue the operations until 2008. That the Secretary may have made an initial determination to discontinue operations under the original concessions contract on July 5, 2007 does not alter the court's analysis of the proper method of valuing Seven Resorts' possessory interest.

concessions contract did not provide a measure of compensation for Seven Resorts' possessory interest because a successor did not take over Seven Resorts' operations under the original concessions contract and the Secretary did not make a determination to discontinue operations "upon" the expiration of the original concessions contract's term.

The court recognizes decisions from the Court of Claims have held that other concessioners were entitled to book value upon the expiration or termination of similar concessions contracts.[33] In *Schoeffel v. United States*, the Court of Claims adopted the opinion of a trial commissioner, which held that a concessioner was entitled to book value upon the expiration of a concessions contract with compensation provisions that were identical to the compensation provisions of the original concessions contract in the above-captioned case. *See Schoeffel v. United States*, 193 Ct.Cl. at 932, 937, 946–47. After entering into a series of contracts with the *Schoeffel* concessioner, NPS decided to discontinue operations under the *Schoeffel* contract during the contract's term. *See id.* at 931. The trial commissioner explained that NPS decided to discontinue operations because it wanted to return the area that was the subject of the contract to its "natural condition," there were "a number of serious deficiencies in the facilities and their operation which posed hazards to public health and safety," and the concession "had been operating at a steady financial loss." *See id.* at 931, 946–47. In addition, the trial commissioner noted that NPS had been threatening to discontinue the operation of the *Schoeffel* concession for over ten years. *See id.* at 931. Although the trial commissioner noted that previous concessions contracts between the parties did not provide a measure of "just compensation" for the termination or taking of the *Schoeffel* concessioner's possessory interest, the trial commissioner explained that "[t]his was cleared up by the additions of sections 5(b)

and 12(a)" of the *Schoeffel* concessions contract, which were identical to the relevant provisions of the original concessions contract in the above-captioned case. *See id.* at 932. The trial commissioner interpreted the *Schoeffel* compensation provisions as "limit[ing] just compensation to book value *for expiration, termination, or taking.*" *See id.* (emphasis added). The Court of Claims subsequently relied on the trial commissioner's statement in *Schoeffel* to conclude in *Eldorado Canyon Resort, Inc. v. United States* that a provision identical to section 12 of the original concessions contract at issue in the above-captioned case entitled the *Eldorado* concessioner to book value when NPS determined, during the term of the *Eldorado* contract, to discontinue operations. *Eldorado Canyon Resort, Inc. v. United States*, 209 Ct.Cl. at 760–61, 538 F.2d 347.

The circumstances of the present case, however, are distinguishable from the circumstances presented in *Schoeffel* and *Eldorado* because the Secretary did not make a determination to discontinue operations during the original concessions contract's term or even "upon its termination." In addition, although the trial commissioner in *Schoeffel* broadly stated that provisions identical to section 5(b) and section 12(a) of the original concessions contract at issue in the above-captioned case "limit[ed] just compensation to book value for expiration, termination, or taking," the language used in section 5(b) and section 12(a) indicate that the trial commissioner's statement cannot be interpreted to mean that, under identical compensation provisions, Seven Resorts is entitled to book value "upon expiration, termination, or taking," regardless of the state of the parties' relationship after the expiration of the original concessions contract's term. *See Schoeffel v. United States*, 193 Ct.Cl. at 932. Under section 12(a), the Secretary was obligated to provide Seven Resorts with (1) sound val-

---

**33.** Other decisions that have determined the value of a concessioner's possessory interest upon the expiration or termination of similar concessions contracts involved compensation provisions that were identical to the compensation provisions of the original concessions contract at issue in the above-captioned case. *See, e.g., Schoeffel v. United States*, 193 Ct.Cl. at 932, 937, 946–47;

*Eldorado Canyon Resort, Inc. v. United States*, 209 Ct.Cl. 759, 760–61, 538 F.2d 347 (1976) (unpublished table decision). The parties have stipulated that "[t]he form of the Contract at CC–LAME003–74 was the NPS standard language concession contract as in effect as of the time of execution as modified to reflect the specifics of the operation."

ue when Seven Resorts "cease[d] to be authorized to conduct the operations ... and thereafter such operations are to be conducted by a successor," or (2) book value if, during the contract's term or "upon its termination for any reason," the Secretary determined that it was "desirable to discontinue" the operations authorized under the original concessions contract. In addition, section 12(a) stated that "[p]ayment of the compensation provided for in this section will terminate the Concessioner's possessory interest in the improvements to which it relates and will constitute just compensation for the termination or taking of such possessory interest," corresponding to section 5(b), which provided that "[p]erformance of the obligations assumed by the Secretary under Section 12 herein shall constitute just compensation *in the circumstances therein described.*" (emphasis added). Section 5(b) established that Seven Resorts was entitled to "just compensation" for its possessory interest, and that section 12(a) provided the measure of Seven Resorts' possessory interest in two specified scenarios. Section 5(b)'s reference to the "circumstances ... described" in section 12(a) indicates that Seven Resorts was entitled to an undefined form of "just compensation" in circumstances that were not described by section 12. Section 5(b) and section 12(a), therefore, jointly establish that Seven Resorts was to be compensated with book value if the Secretary determined that it was desirable to discontinue operations during the original concessions contract's term or "upon its termination for any reason," not that Seven Resorts was to be compensated with book value upon the expiration of the original concessions contract's term regardless of the surrounding circumstances. *See id.* To interpret the trial commissioner's broad interpretation of identical provisions in *Schoeffel* otherwise would require that Seven Resorts be compensated with book value even if it ceased operations at the expiration of the original concessions contract's term, "and thereafter such operations [were] to be conducted by a successor," which directly contradicts section 12(a)(1) of the original concessions contract.

Pursuant to the 1998 Concessions Act, therefore, the value of Seven Resorts' possessory interest must be determined pursuant to the 1965 Concessions Act because the original concessions contract did not define the "amount and manner" of compensating Seven Resorts for its possessory interest when the Secretary did not make a determination to discontinue operations until approximately eleven years after the expiration of the original concessions contract's term. *See* § 405(b), 112 Stat. at 3509 ("Where such a possessory interest is not described in the existing contract, compensation of possessory interest shall be determined in accordance with the laws in effect on the day before the date of enactment of this Act."). With respect to the valuation of a concessioner's possessory interest, 1965 Concessions Act provided:

A concessioner who has heretofore acquired or constructed or who hereafter acquires or constructs, pursuant to a contract and with the approval of the Secretary, any structure, fixture, or improvement upon land owned by the United States within an area administered by the National Park Service shall have a possessory interest therein.... The said possessory interest shall not be extinguished by the expiration or other termination of the contract and may not be taken for public use without just compensation.... *Unless otherwise provided by agreement of the parties, just compensation shall be an amount equal to the sound value of such structure, fixture, or improvement at the time of taking by the United States* determined upon the basis of reconstruction cost less depreciation evidenced by its condition and prospective serviceability in comparison with a new unit of like kind, but not to exceed fair market value.

§ 6, 79 Stat. at 970 (emphasis added).

Like the 1998 Concessions Act, the 1965 Concessions Act requires the court to analyze the original concessions contract to determine whether the parties "otherwise provided by agreement" that Seven Resorts would not receive sound value for its possessory interest. Although technically distinct from the court's analysis of whether a possessory interest was "described" in the original concessions contract, a similar analysis

applies to whether the parties "otherwise provided by agreement" that Seven Resorts was not to receive sound value for its possessory interest. As indicated above, although the parties agreed that "[p]erformance of the obligations assumed by the Secretary under Section 12 herein shall constitute just compensation in the circumstances therein described," section 12 of the original concessions contract did not describe the nature of the parties' relationship at or near the expiration of the original concessions contract's term. Section 5(b) of the original concessions contract indicated that Seven Resorts could be entitled to "just compensation" for its possessory interest in circumstances not described in section 12. Operations at Lake Mead Lodge were not overtaken by a successor and the Secretary did not determine to discontinue operations at Lake Mead Lodge, after much back and forth, until, perhaps, approximately eleven years after the expiration original contract's term in 1998. The original concessions contract, therefore, did not "otherwise provide" a measure of just compensation for Seven Resorts' possessory interest in the circumstances presently before the court.

Decisions that have construed the 1965 Concessions Act's provision for sound value, even those awarding book value, have recognized that sound value is the default valuation of a concessioner's interest in circumstances not provided for in a concessions contract. The court recognizes that in *Fordyce v. United States*, the Court of Claims, relying on *Schoeffel* and *Eldorado*, indicated in dicta that book value was a concessioner's " 'total and exclusive remedy' " under concessions contracts with identical compensation provisions to the provisions at issue in the above-captioned case. *Fordyce v. United States*, 228 Ct.Cl. 1, 6, 650 F.2d 1191, 1194 (1981) (quoting *Eldorado Canyon Resort v. United States*, 209 Ct.Cl. at 761, 538 F.2d 347) (citing *Schoeffel v. United States*, 193 Ct.Cl. 923). The Court of Claims in *Fordyce*, however, relied on language in *Eldorado* that specifically applied to the circumstances in which the decision to discontinue operations was made during the term of a concessions contract. *See id.* (quoting *Eldorado Canyon Resort v. United States*, 209 Ct.Cl. at 761,

538 F.2d 347). Moreover, despite the Court of Claims' generalized statement in *Fordyce* regarding book value, the *Fordyce* court recognized that "the Concessions Policies Act [the 1965 Concessions Act] established sound value as the general standard, and did not limit that standard to those cases in which a new concessioner would continue the concession operation with the existing facilities." *See Fordyce v. United States*, 228 Ct.Cl. at 9, 650 F.2d at 1195. The Court of Claims, therefore, recognized that sound value was the default valuation provided by the 1965 Concessions Act, and that a concessioner could be entitled to sound value under the 1965 Concessions Act in circumstances beyond those covered by section 12(a) of the original concessions contract: the continuation of operations by a successor contractor. *See id.*; *see also* S.Rep. No. 89–765, 1965 U.S.C.C.A.N. 3,489, 3,491–92 (stating with respect to the Senate bill that became the 1965 Concessions Act: "[T]he bill recognizes that compensation must be paid for the possessory interest if it is taken by the Government for its own use. Unless otherwise agreed upon by the parties the compensation will be—an amount equal to the sound value of such structure, fixture, or improvement at the time of taking by the United States. . . . It will be noted, in addition, that the parties may, if they choose, adopt another standard by explicit provision in their contract."). Notwithstanding the broad language utilized in *Fordyce*, therefore, the court determines that the 1965 Concessions Act's default provision for sound value is applicable to the facts of the above-captioned case.

Pursuant to the 1965 Concessions Act, Seven Resorts is entitled to sound value for the possessory interest created under the original concessions contract. Although the original concessions contract expired before the effective date of the 1998 Concessions Act, the 1998 Concessions Act was in effect when NPS took possession of Lake Mead Lodge. Under the 1998 Concessions Act, as compensation for the taking of its possessory interest, Seven Resorts was entitled to either: (1) a leasehold surrender interest if Seven Resorts was "awarded a new concessions contract . . . replacing an existing concessions

contract," or (2) the value of its possessory interest as described in the original concessions contract or, if the value of Seven Resorts' possessory interest is not described in the original concessions contract, as described in the 1965 Concessions Act. *See* § 405(b), 112 Stat. at 3509. Seven Resorts was not "awarded a new concessions contract ... replacing an existing concessions contract" after the expiration of the original concessions contract's term. Instead, Seven Resorts continued operations, likely pursuant to an implied-in-fact contract followed by the 1998 Letter Authorization, which NPS issued pursuant to section 12(b) of the original concessions contract. Seven Resorts then continued operations purportedly pursuant to the 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, and 2008 Letter Authorizations, but NPS did not invoke a valid authority pursuant to which NPS could have awarded Seven Resorts a concessions contract during the time period covered by the Letter Authorizations. Seven Resorts continued operations for a prolonged period of time after the expiration of the original concessions contract's term without being replaced by a successor, a scenario not envisioned by the original concessions contract. Under the 1998 Concessions Act, Seven Resorts is entitled to compensation for its possessory interest as provided by the 1965 Concessions Act. Because the original concessions contract did not provide a measure of compensation for Seven Resorts' possessory interest in the circumstances presently before the court, and because the original concessions contract envisioned that Seven Resorts may be entitled "just compensation" not described in the original concessions contract, the 1965 Concessions Act's default provision for sound value applies. *See* § 6, 112 Stat. at 3509. Under the 1965 Concessions Act, as incorporated by the 1998 Concessions Act, therefore, Seven Resorts is entitled to sound value for its possessory interest in Lake Mead Lodge.[34]

---

34. Because the court concludes that Seven Resorts is entitled to sound value for its possessory interest, the court does not address Seven Resorts' apparent invocation of equitable estoppel

## CONCLUSION

For the foregoing reasons, plaintiff's motion for partial summary judgment is **GRANTED** and the defendant's cross-motion for partial summary judgment is **DENIED**. The plaintiff's possessory interest in the Lake Mead Lodge facilities is properly valued using the sound value methodology provided by the 1965 Concessions Act.

**IT IS SO ORDERED.**

in its argument that NPS "misled Seven Resorts by promising year after year to locate a new concessioner and Seven Resorts detrimentally relied on those promises."